### UNITED STATES v. REID.
#### No. 7476.

Circuit Court of Appeals, Ninth Circuit.
Oct. 15, 1934.

154

Carl C. Donaugh, U. S. Atty., and Hugh L. Biggs, Asst. U. S. Atty., both of Portland, Or., for the United States.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

Arla M. Reid, the appellee, a Canadian citizen, petitioned the District Court of the United States for the District of Oregon for naturalization under the Act of September 22, 1922 (42 Stat. 1021), as amended July 3, 1930 (46 Stat. 854 [8 USCA § 369]), which authorizes naturalization of alien women who have lost their American citizenship by marriage to an alien. The government opposed her petition for naturalization upon the ground that she was already a Canadian citizen at the time of her marriage and consequently did not lose her American citizenship by marriage and that the law invoked by pe-

titioner is not applicable. The court overruled the objections of the government and admitted the petitioner to citizenship. The government appeals.

The petitioner was born in Newton, Iowa, on March 31, 1901. She removed to Canada with her parents two or three years later and resided there until January 23, 1933, when she entered the United States at Blaine, Wash., solely for a visit and not for permanent residence. Her father was naturalized in Canada June 27, 1907, while the petitioner was residing with him in Canada. As the petitioner was a citizen of the United States by birth, the question at issue resolves itself into that of whether or not she became a citizen of Canada by reason of her father's naturalization. The law of Canada in force at the time of her father's naturalization expressly so provided, as follows:

"If the father, or the mother, being a widow, has obtained a certificate of naturalization within Canada, every child of such father or mother who, during infancy, has become resident with such father or mother within Canada, shall, within Canada, be deemed to be a naturalized British subject." (Section 26, c. 113, Revised Statutes of Canada, 1886.)

The treaty of September 16, 1870, then in force between the United States and Great Britain (16 U. S. Stat. 775) provided that American citizens naturalized according to law in the British dominions should be held by the United States to be British subjects. We quote:

"Article I. Citizens of the United States of America who have become, or shall become, and are naturalized according to law within the British dominions as British subjects, shall, subject to the provisions of Article II, be held by the United States to be in all respects and for all purposes British subjects, and shall be treated as such by the United States.

"Reciprocally, British subjects who have become, or shall become, and are naturalized according to law within the United States of America as citizens thereof, shall, subject to the provisions of Article II, be held by Great Britain to be in all respects and for all purposes citizens of the United States, and shall be treated as such by Great Britain. * * *

"Article III. If any such citizen of the United States as aforesaid, naturalized within the dominions of her Britannic Majesty, should renew his residence in the United States, the United States government may, on

his own application and on such conditions as that government may think fit to impose, readmit him to the character and privileges of a citizen of the United States, and Great Britain shall not, in that case, claim him as a British subject on account of his former naturalization."

Article 2 of the treaty deals with the right of naturalized citizens to renounce their new allegiance within two years after the ratification of the treaty (1872) and has no application here.

For the courts of the United States to treat the petitioner as an American citizen instead of a British subject after the naturalization of her father in 1907, would be to expressly violate the terms of the treaty of 1870 with Great Britain, which required her to be treated by the United States "in all respects and for all purposes as a British subject" from and after that date.

■ The treaty is a law of the United States entitled to be enforced in the courts of the United States. Article 6, cl. 2, of the Constitution provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

"A treaty is not only a law, but also a contract between two nations; and, under familiar rules, it must, if possible, be so construed as to give full force and effect to all its parts." Goetze v. U. S. (C. C.) 103 F. 72, 73, reversed 182 U. S. 221, 21 S. Ct. 742, 45 L. Ed. 1065.

It is suggested that the treaty, in so far as it takes away the citizenship of a minor child without her consent, is violative of the Constitution of the United States. It is doubtful if courts have power to declare the plain terms of a treaty void and unenforceable, thus compelling the nation to violate its pledged word, and thus furnishing a causus belli to the other contracting power. As stated by the Supreme Court, speaking through Justice Holmes, in Missouri v. Holland, 252 U. S. 416, 432, 40 S. Ct. 382, 383, 64 L. Ed. 641, 11 A. L. R. 984:

"It is said that a treaty cannot be valid if it infringes the Constitution, that there are limits, therefore, to the treaty-making power, and that one such limit is that what an act of Congress could not do unaided, in derogation of the powers reserved to the States, a treaty cannot do. * * *

"Acts of Congress are the supreme law of the land only when made in pursuance of the Constitution, while treaties are declared to be so when made under the authority of the United States. It is open to question whether the authority of the United States means more than the formal acts prescribed to make the convention. We do not mean to imply that there are no qualifications to the treaty-making power; but they must be ascertained in a different way. It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, 'a power which must belong to and somewhere reside in every civilized government' is not to be found."

It cannot be seriously contended that naturalization of the citizens of the contracting powers is not within the treaty-making power of a nation. The Supreme Court has recently so held, in the case of Santovincenzo v. Egan, 284 U. S. 30, 40, 52 S. Ct. 81, 84, 76 L. Ed. 151, from which we quote as follows:

"The treaty-making power is broad enough to cover all subjects that properly pertain to our foreign relations, and agreement with respect to the rights and privileges of citizens of the United States in foreign countries, and of the nationals of such countries within the United States * * * is within the scope of that power. * * *"

■ The United States has consistently adhered to the principle that the naturalization of a parent effects the naturalization of a minor child residing with the parent. As early as March 26, 1790, Congress enacted a law to that effect (1 Stat. 103) as follows:

"* * * And the children of such persons so naturalized, dwelling within the United States, being under the age of twenty-one years at the time of such naturalization, shall also be considered as citizens of the United States."

This statute, slightly amended in 1802 (2 Stat. 153), was in effect at the time the above treaty with Great Britain was ratified in 1870. At that time Congress was insisting on the right of expatriation for children as well as adults, as evidenced by a resolution passed July 27, 1868, as follows:

"Whereas the right of expatriation is a natural and inherent right of all people, in-

dispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this Government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic." Act July 27, 1868, Rev. St. 1878, § 1999, 8 USCA § 15.

Great Britain recognized this contention by Act of Parliament passed in 1870 (33 and 34 Vict., c. 14, par. 10), as follows:

"When a parent has, by the exercise of the right of expatriation, become an alien, the children of such parent who, during infancy, have become residents of the country of which the parent is a naturalized citizen, and who, according to the laws of such country, have become naturalized therein, shall cease to be British subjects."

The state department has consistently adhered to this view in dealing with foreign governments concerning the rights of minors naturalized in this country by the naturalization of the father, and vice versa. We quote from appellant's brief a letter from the secretary of state dated October 7, 1931, as follows:

"This Department has for many years uniformly held that former citizens of the United States who have been naturalized during minority in foreign states through the naturalization of their parents must be regarded as having lost their American nationality under the provisions of section 2 of the Act of Congress of March 2, 1907 (34 Stat. 1228 [8 USCA § 17]) 'That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws'; also that the provisions contained in the naturalization treaties between the United States and other countries, including the naturalization treaty of May 26, 1869, with Norway and the protocol of the same date, are applicable to the cases of persons naturalized during minority through the naturalization of their parents, as well as to the cases of persons naturalized after attainment of majority upon their own application."

See, also, III Moore, Int. Law Digest 472, citing letter from United States Secretary of State Hay to our German Ambassador, Mr. Harris, dated January 22, 1900; also a similar letter from Secretary of State Hay to Mr. White, our German Ambassador, July 15, 1902. This historical attitude of the state department should be of great, if not controlling, weight in construing our treaty and statutes relating thereto. See U. S. v. Johnston, 124 U. S. 236, 8 S. Ct. 446, 455, 31 L. Ed. 389, from which we quote as follows:

"The contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous."

This rule would apply with even more cogency where the state department is negotiating with the other treaty-making power concerning the meaning and effect of a treaty, and during such negotiations insists upon a not unreasonable construction of its terms which is acquiesced in by the other power.

It is suggested that after the naturalization of the petitioner's father the petitioner was a citizen of both the United States and of Great Britain with the right to elect her sovereign after attaining her majority and that as her marriage occurred while she was still a minor her American citizenship was lost by reason of her marriage, and consequently the act under which she applied for naturalization applies to her. We think that the purpose of the treaty of 1870 with Great Britain, and of the laws enacted in pursuance thereof by both contracting powers, or impicitly recognized thereby was to do away with all cases of dual citizenship arising from the operation of the naturalization laws of the two contracting powers, and that in the case of petitioner there never was such dual citizenship. We have read the opinion of the trial judge with great interest, but deem it unnecessary to pursue the subject further for we think it clear that the petitioner became a naturalized citizen of Canada and Great Britain by the naturalization of her father while she was a minor residing with him in Canada and that such naturalization terminated her American citizenship. This conclusion is in accord with the holding of the Supreme Court of Minnesota in two recent cases (Ostby v. Salmon, 177 Minn. 289,

225 N. W. 158; Koppe v. Pfefferle, 188 Minn. 619, 248 N. W. 41). See, also, opinion of the Attorney General, In re Citizenship of Ingrid Theresa Tobiassen, 36 Op. Attys. Gen. 535, citing U. S. v. Kellar (C. C.) 13 F. 82, 85; U. S. ex rel. Patton v. Tod (C. C. A. 2) 297 F. 385, 392.

Order reversed.