## DOS REIS ex rel. CAMARA v. NICOLLS.

### Civ. No. 7236.

District Court, D. Massachusetts.

Nov. 15, 1946.

David Silverstein, of Fall River, Mass., for plaintiff.

Oliver S. Remington, Acting District Director of Immigration and Naturalization, George F. Garrity, U. S. Atty., and Gerald J. McCarthy, Asst. U. S. Atty., all of Boston, Mass., for Henry Nicolls.

HEALEY, District Judge.

This is the petition of Arthur C. dosReis on behalf of Joao Camara who is now detained at Westover Air Field, Spring-field, Massachusetts, under order of deportation issued by the Attorney General, and now in custody of the District Director of Immigration and Naturalization.

The petition was filed October 3, 1946. On that date, the court ordered the issuance of a summons to show cause returnable October 7, 1946. At the hearing on that date, it was ordered that the writ should issue, returnable within 10 days. The respondent's return was filed October 11, 1946, and the hearing on the writ was held on October 15 and 16, 1946.

The petitioner has instituted this proceeding for a writ of habeas corpus on the ground, among others, that the relator is a natural-born citizen of the United States. The Commissioner of Immigration and Naturalization in affirming the excluding decision of the Board of Special Inquiry, found as a fact that the relator was a natural-born citizen, but on the basis of other findings of fact, which are not subject to review here, concluded that the relator had forfeited his United States citizenship under the provisions of Section 401(c) of the Nationality Act of 1940, 8 U.S.C.A. § 801(c).

Since I have been unable to find any case which has judicially interpreted Section 401(c) of the Nationality Act of 1940, and since under decisions of the United States Supreme Court in cases interpreting the Act of 1907, 34 Stat. 1228, from which this Act was derived, citizenship could not be lost, except by a purely voluntary act of the person concerned, (Perkins v. Elg, 307 U.S. 325, 334, 59 S.Ct. 884, 83 L.Ed. 1320), I ordered the writ to issue in this case solely to determine whether or not the officials of the Department of Justice had erred in their conclusion that the relator had forfeited his American citizenship under the circumstances. Marslin v. Schmucker, 4 Cir., 89 F.2d 765; Colyer v. Skeffington, D.C., 265 F. 17, 19; Ex parte Koerner, 9 Cir., 176 F. 478; Lavin v. LeFevre, 9 Cir., 125 F. 693. The facts to be found from the evidence introduced at the hearing are as follows:

The relator was born in the City of Fall River, Massachusetts, on December 31, 1921. His father was a native and citizen

of Portugal, and his mother was a native of Brazil. On or about July 4, 1934, the petitioner was taken to the island of Saint Michael in the Azores by his parents and he resided in the Azores with his parents until about October 27, 1943, when he was called for service in the Portuguese Army, in which he served until about October 26, 1945.

When the relator learned that he was about to be called into service in the Portuguese Army, he, in company with other young men of American birth who lived in the same vicinity, went to see the Consul, but was told by some one at the Consulate that if he wanted to join the American Army and avoid service in the Portuguese Army, he should return to America. The cost of passage to America at that time was prohibitive for a person of very small means, and the relator, being without sufficient funds was unable to pay the cost of his passage, so he remained in the Azores. On reporting to the Portuguese military authorities, he told them of his American citizenship and of his desire not to serve in the Portuguese Army. He was told that the only way in which he could escape service in the Portuguese Army was to go to a concentration camp, since, according to the law of Portugal, relator was a Portuguese citizen. He was then inducted into the Portuguese Army, and served as a soldier therein for a period of two years. Relator did not swear allegiance to Portugal at any time while in the army.

Upon his release from the Portuguese Army, relator obtained a job in the Azores as a salesclerk in the Post Exchange at an American Army Air Transport Command Base. While working at that base, he secreted himself in the baggage compartment of an air transport command plane on August 8, 1946, and arrived at Westover Field, Chicopee, Massachusetts, on August 9, 1946.

After the arrival of the plane at Westover Field, relator's presence in the plane was discovered, and he was put under arrest and turned over to the Immigration authorities, when it was learned that he had no immigration visa, passport, or other travel document.

The relator was given a hearing before a board of special inquiry of the Immigration and Naturalization Service on the day of his arrival at Westover Field. He was not represented by counsel, nor told that he had any right to be represented by counsel at that hearing. He was told that he had the right to have a friend or relative with him at the hearing, and was asked, "Have you such a friend or relative immediately available?" He answered, "No." The Board of Inquiry determined that relator was an alien; namely, a citizen of Portugal, and that since he was not in possession of a valid Portuguese passport or an unexpired quota immigration visa, that he should be refused admission to the United States.

On August 15, 1946, the relator indicated to an immigration inspector on duty at Westover Field that he desired to take an appeal from the decision of the special board of inquiry excluding him from the United States.

On August 26, 1946, the hearing was reopened by the Immigration authorities for the purpose of developing additional information. The Board of Inquiry again found that the relator was not entitled to admission into the United States. The relator then expressed his desire to appeal this decision to the Attorney General at Washington, D. C.

The decision of the special board of inquiry was affirmed by the Commissioner of Immigration and Naturalization, and the case was referred by him to the Board of Immigration Appeals for consideration, which Board also affirmed the excluding decision of the Board.

The reason ascribed by the Board of Inquiry for its determination that the relator was an alien and not an American citizen, was that he had become expatriated according to their interpretation of Section 401(c) of the Nationality Act of 1940, 8 U.S.C.A. § 801(c). The terms of Section 401 are as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * *

"(c) Entering, or serving in, the army forces of a foreign state unless expressly

authorized by the laws of the United States, if he has or acquires the nationality of such foreign state."

This section of the Act was added to the Nationality Code on October 14, 1940, when Congress passed the revision and codification of the nationality laws. At that time, several new means of losing United States nationality were set forth in the Act.

In explaining the reasons for some of the changes made in the nationality laws to the House of Representatives, Congressman Dickstein pointed out that the Committee on Immigration and Naturalization intended to put an end to dual citizenship and relieve this country of the responsibility of those who reside in foreign lands and only claim citizenship when it serves their purpose. (Congressional Record, Vol. 86, Part 11, 76th Congress, 3d Session, September 11, 1940, p. 11,944, column 1.) Among those he specifically mentioned as within this class were, "Children of alien parents or naturalized parents whose parents return to their native land and become naturalized or repatriated."

Mr. Rees of Kansas in debate on this bill in the House of Representatives on October 4, 1940, (Congressional Record, p. 13,246), said:

"I might go back and explain a little further that the reason for this particular amendment comes about largely because it is said that there are persons from certain countries who have gone to the United States or its possessions and have children born here or in our possessions that returned to the country of their parents and acquired dual citizenship of such country. They join the army of that country without taking the oath. They have returned to this country and we are never able to tell whether they have been in those armies or not. We would like to find out the facts if we can. So we are cutting their citizenship off except under certain circumstances and conditions.

"Now, all in the world we are saying here is, in substance, that if a person has a dual citizenship in a country where he joined the army, he loses his citizenship, but if he is an American citizen without dual citizenship and has joined a foreign army without taking the oath, he does not lose his citizenship  *  *  *."

On page 13,250 of the same record appears the following statement by Congressman Rees in answer to a question by Congressman Hinshaw. "Let us divide the question. If an individual is born in the United States and joins the army without taking an oath of allegiance of the country of his dual citizenship, that is, he is born here of foreign parentage and as a child is taken by his parents to the country from which his parents came, and becomes a citizen of that country because of the parentage of his father and mother or his father or mother, as the case may be—that person would lose his citizenship."

■ From these expressions of members of the House Committee on Immigration and Naturalization, which committee submitted this bill (HR 9980) in its original form, it appears that in adding the Section 401(c) to the bill, Congress intended to deprive of American nationality, persons who, like the relator, had dual citizenship and joined the army of the foreign state in which they held dual citizenship.

■ It is argued on behalf of the relator that no person can be deprived of his American nationality by other than his own voluntary act, and that the relator neither acquired Portuguese nationality, nor served in the Portuguese Army by any voluntary act of his own. While it is apparently true that the relator did not enter the Portuguese Army on a purely voluntary basis, and his Portuguese nationality was derivative only and not voluntary, he still, in my opinion, falls within the class deprived of American nationality by Section 401(c) of the Nationality Act of 1940.

It was apparently the intent of Congress that any one who came within the various classes enumerated in Section 401, whether voluntarily or involuntarily, should be considered as having lost his American nationality. In this respect, it is to be noted that the word "expatriate" is not to be found in this Act as it is to be found in the former Act of 1907, 34 Stat. 1228. The Act of 1907 provided in Section 2, "That any American citizen shall be deemed to have

expatriated himself" when he has performed certain acts. The present Section 401 states: "A person who is a national of the United States * * * shall lose his nationality by * * *." enumerating certain acts. Taking into consideration the fact that in Perkins v. Elg, 307 U.S. 325, at page 334, 59 S.Ct. 884, at page 889, 83 L.Ed. 1320, the Supreme Court defined expatriate as "the voluntary renunciation or abandonment of nationality and allegiance", this change of terminology would seem to be consistent with the statements of Congressman Rees quoted above, and lead to the conclusion that a person can lose his American nationality by any of the means mentioned in Section 401, whether such act or acts be voluntary or involuntary.

In my opinion, therefore, the relator, having the dual nationality of Portugal and the United States by birth, lost his American nationality by his service in the Portuguese Army, and is now an alien insofar as the United States is concerned.

The relator, being an alien; namely, a citizen of Portugal not in possession of a valid Portuguese passport or an unexpired immigration visa as required, is properly held in custody for deportation by the respondent.

The writ of habeas corpus is dismissed.