**DOS REIS ex rel. CAMARA v. NICOLLS,**
**Dist. Director of Immigration &**
**Naturalization.**
**No. 4230.**

Circuit Court of Appeals, First Circuit.

April 2, 1947.

Rehearing Denied May 22, 1947.

David Silverstein, of Fall River, Mass., for petitioner.

Gerald J. McCarthy, Asst. U.S. Atty., of Boston, Mass. (William T. McCarthy, U. S. Atty., of Boston, Mass., on the brief), for respondent.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Section 401 of the Nationality Act of 1940, 54 Stat. 1168, 8 U.S.C.A. § 801, contains the following provision: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state". The question now before us is whether under this provision loss of nationality results where such a person was over his protest drafted into the foreign military service, or whether § 401(c), properly construed, is to be limited to cases where the induction into the foreign military service may be said to have been voluntary. We have concluded that the latter is the correct view.

Joao Camara was born in Fall River, Massachusetts, on December 31, 1921. His father was a native and citizen of Portugal who, so far as appears, was never naturalized in the United States. His mother was a native of Brazil. Camara continued to reside in Massachusetts until he was twelve years old, when he was taken by his parents to San Miguel in the Azores.

On or about October 27, 1943, at which time Camara was twenty-one years of age, he received a draft notice for service in the Portuguese army. He made inquiries at the American consulate and was told by someone there that if he wanted to join the American army and avoid service in the Portuguese army, he could return to America. This was cold comfort for Camara, who was without funds to pay the cost of his passage. (It might be doubted, further, whether the Portuguese Government would have permitted him to leave under the circumstances.) On reporting to the Portuguese military authorities, Camara told them that he was an American citizen and that he did not wish to serve in the Portuguese army. Having been informed that, under the law of Portugal, he was a Portuguese citizen and that the only alternative to service in the army was a concentration camp, Camara submitted to induction into the Portuguese army, in which he served until discharged about October 26, 1945. He did not swear allegiance to Portugal at any time.

Upon his release from the Portuguese army Camara obtained a job as sales clerk in the post exchange at an American Army Air Transport Command base at Santa Maria, Azores. He there secreted himself in the baggage compartment of an Air Transport Command plane on August 8, 1946, and arrived at Westover Field, Chicopee, Massachusetts, the next day. He was taken in custody by the immigration authorities and given a hearing before a Board of Special Inquiry of the Immigration and Naturalization Service. The board determined, on the facts as above summarized, that Camara was an alien, a citizen of Portugal, having lost his American nationality by the operation of § 401 (c) of the Nationality Act of 1940; that as an alien arriving as a stowaway and not in possession of a valid Portuguese passport or of an unexpired quota immigration visa, he was excludable from the United States. The decision of the board was affirmed by the Commissioner of Immigra-

tion and Naturalization and, upon further review, by the Board of Immigration Appeals.

Thereafter, a petition for a writ of habeas corpus was filed in the court below on Camara's behalf. The district court ordered that the writ be issued, and the case came on for hearing upon respondent's return to the writ. On November 15, 1946, the district court entered its order dismissing the petition, discharging the writ, and remanding Camara to the custody of respondent. The present appeal is from this order.

In its opinion the district court recognized that Camara did not enter the Portuguese army on a voluntary basis, and that his Portuguese nationality was derivative from his father and not voluntary. But it read § 401(c) as applicable to deprive Camara of his American nationality whether he was inducted into the Portuguese army voluntarily or involuntarily. D.C., 68 F.Supp. 773.

■■■ When Camara was born in Massachusetts in 1921, he then became an American citizen, not by gift of Congress, but by force of the Constitution of the United States (Fourteenth Amendment). United States v. Wong Kim Ark, 1898, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890. When he was taken to Portugal during his minority, Portugal had a claim upon him as a Portuguese citizen, by derivation from his father's citizenship. His case presented a familiar situation of dual nationality as recognized in international law. But Camara has never forsworn his American allegiance; upon the contrary he has done what he could to assert it and preserve it. His service as a draftee in the Portuguese army, with a concentration camp as the alternative, was under duress. As soon as he could manage it he returned to this country, as a stowaway, which attests the intensity of his purpose to retain his American nationality.

■■ It is by no means clear that Congress would have power to deprive a native-born American citizen of his nationality under the circumstances here presented.[1] In United States v. Wong Kim Ark, supra, the court said, 169 U.S. at page 703, 18 S. Ct. at page 477, 42 L.Ed. 890: "The power of naturalization, vested in Congress by the Constitution, is a power to confer citizenship, not a power to take it away." By the Act of July 27, 1868, 15 Stat. 223, 8 U.S. C.A. § 800, Congress declared that the "right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness". The reference, of course, is to voluntary expatriation. Mackenzie v. Hare, 1915, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297, Ann.Cas. 1916E, 645, is authority for the proposition that Congress has some legislative power on the subject of nationality and loss of nationality. In that case the Citizenship Act of 1907, 34 Stat. 1228, provided that "any American woman who marries a foreigner shall take the nationality of her husband." After the passage of the Act, a native-born American woman married a subject of Great Britain in California. The husband was then residing in California, and it was his intention to make California his permanent residence, though it does not appear that he intended ever to become a naturalized citizen of the United States. The woman applied to register as a voter in California but was turned down on the ground that she had, by her marriage, ceased to be a citizen of the United States, and this ruling was upheld in the California courts and by the Supreme Court of the United States. The Citizenship Act of 1907 was held to be applicable, though the woman had never taken up a residence abroad subsequent to her marriage. As so applied, the Act was held valid. The woman had chosen to marry a foreigner in the face of a statutory provision that such marriage constituted a renunciation of American citizenship—"a condition voluntarily entered into, with notice of the consequences." But the opinion of the court in Mackenzie v. Hare, 239 U.S. at page

---

[1] The treaty making power of the United States in this field may well be broader than the legislative power of Congress. Missouri v. Holland, 1920, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984; United States v. Reid, 9 Cir.. 1934. 73 F.2d 153.

311, 36 S.Ct. at page 108, 60 L.Ed. 297, Ann.Cas.1916E, 645, was careful to add: "It may be conceded that a change of citizenship cannot be arbitrarily imposed, that is, imposed without the concurrence of the citizen. The law in controversy does not have that feature."

From the language of § 401(c) and its legislative history, we think an interpretation which avoids this constitutional question is fully warranted.

The draft of the Nationality Act of 1940 originated, not in the Congress, but in the executive departments. By Executive Order of the President of April 25, 1933, No. 6115, the Secretary of State, the Attorney General, and the Secretary of Labor were designated a committee to review the nationality laws of the United States, to recommend revisions, and to codify the laws into one comprehensive nationality law for submission to the Congress. Pursuant to this order, the Cabinet committee set up a committee of advisers composed of representatives of the three departments to study the existing laws governing nationality and to prepare a draft code. This proved to be a task of great complexity, and the draft code, together with explanatory comments section by section, was not completed until August 13, 1935. After further study by the Cabinet committee, which made certain changes in the draft, the proposed code, with explanatory comments thereto, was transmitted to the President under cover of a Letter of Submittal dated June 1, 1938, signed by the three members of the Cabinet committee. On June 13, 1938, the President transmitted to the Congress the report of the Cabinet committee, accompanied by the draft code and explanatory comments. Section 401(c) of the draft code as thus submitted to Congress then read:

"Sec. 401. A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\*     \*     \*     \*     \*     \*

(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States;".

The explanatory comment to this section stated:

"This provision is based upon the theory that an American national who, after reaching the age of majority (see proviso (2) to this section, infra) voluntarily enters, or continues to serve in, the army of a foreign state, thus offering his all in support of such state, should be deemed to have transferred his allegiance to it. The words 'serving in' would apply to the case of one who had entered the army of a foreign state before attaining the age of majority but who, after reaching such age, had continued to serve in it." [2]

It is to be noted that subsection (c) of the draft code was not limited to cases of dual nationality; and unless the words "entering, or serving in, the armed forces of a foreign state" implied that the induction must be voluntary, then any American citizen who, during a visit abroad, might be grabbed and put in the army of the foreign state would automatically lose his American citizenship. This, of course, was never the intention of those who drafted the code; as is further evidenced by a statement by the Cabinet committee in its Letter of Submittal to the President: "None of the various provisions in the Code concerning loss of American nationality \* \* \* is

---

[2] The parenthetical reference is to proviso (2) to § 401 of the draft code reading: "That no national under eighteen years of age can expatriate himself under subsections (b) to (h) inclusive." The explanatory comment to this proviso stated: "The reasons for adopting this provision are obvious. It does not seem reasonable that an immature person should be able to expatriate himself by any act of his own. \* \* \* It will be observed that in this subsection the age below which a person cannot expatriate himself is set at 18 years, instead of 21 years. It is believed that a person who has reached the age of 18 years should be able to appreciate fully the seriousness of any act of expatriation on his part. \* \* \* " This proviso now appears in § 403(b) of the Act, 8 U.S. C.A. § 803(b).

The comment to this proviso obviously fits in with the comment to § 401(c) above quoted to the effect that loss of nationality is to be predicated upon the act of voluntarily entering into the army of a foreign state.

designed to be punitive or to interfere with freedom of action. They are merely intended to deprive persons of American nationality when such persons, by their own acts, or inaction, show that their real attachment is to the foreign country and not to the United States."

The draft code was embodied in H.R. 6127, 76th Cong., 1st Sess., and introduced into the House by Representative Dickstein on May 3, 1939. The bill was referred to the Committee on Immigration and Naturalization which gave it lengthy consideration, first in hearings before a subcommittee and later before the full committee. In the course of the hearings it became evident that the members of the committee were well aware that § 401(c) was intended to apply only to cases of voluntary entry and service in a foreign army. In fact Mr. Richard W. Flournoy, Assistant Legal Adviser of the State Department, in his testimony before the subcommittee expressly objected to the subsection on that ground (though the Secretary of State had previously joined in submitting the draft code). He proposed a proviso to subsection (c) reading: "Provided, That if a person who has acquired American nationality at birth also has the nationality of a foreign state, through birth in the territory of such foreign state or the fact that one of his parents was a national thereof, and who is residing in such territory at the time when he reaches the age of liability for military service, his entry into the armed forces of such foreign state shall be conclusively presumed to be voluntary." In other words, in all cases of dual nationality, Mr. Flournoy wanted the subsection changed so as to forfeit American citizenship whether the service in the foreign army was voluntary or involuntary. He recognized that subsection (c) as it read in the draft code, and in the pending bill, would, according to past precedents, be construed as excluding cases of duress.[3] The representative of the Labor Department present at the hearing strongly objected to Mr. Flournoy's proposed amendment and maintained that, in all cases, the American citizen should be permitted to establish that his service in the foreign army was in fact not voluntary. The committee declined to make the change suggested by Mr. Flournoy. See Hearings before the Committee on Immigration and Naturalization, 76th Cong., 1st Sess., on H.R. 6127, pp. 149–156, 168–170, 200–203.[4]

As a result of the deliberations of the House Committee, H.R. 9980, embodying changes which had been approved by the committee, was on June 3, 1940 introduced by Mr. Dickstein and referred to the Committee on Immigration and Naturalization. In this bill, § 401(c) remained unchanged from its form in the draft code which had been submitted by the President. H.R. 9980 was reported out by the committee on June 5, 1940, without change. The committee report contained no discussion of § 401. H.R.Rep.No.2396, 76th Cong., 3d Sess. (1940). The debate on the floor of the House was in pretty general terms. Mr. Rees, a member of the Committee on Immigration and Naturalization, referred, in passing, to § 401 as specifying "certain acts causing loss of American nationality, including entry into a foreign army, acceptance of an office under a foreign government, and voting in a political election in a foreign state." 86 Cong.Rec.11,948. No reference was made, however, to the unsuccessful effort by Mr. Flournoy to obtain a committee amendment making § 401(c) applicable even where the service in the foreign army was under duress, in all cases of dual nationality. After the adoption of certain minor amendments not now relevant, the House passed the bill by a voice vote on September 11, 1940.

---

3 Cf. United States ex rel. Fracassi v. Karnuth, D.C.,W.D.N.Y.,1937, 19 F.Supp. 581, 583; McCampbell v. McCampbell, D.C.,W.D.Ky.,1936, 13 F.Supp. 847; United States ex rel. Baglivo v. Day, D.C., S.D.N.Y.,1928, 28 F.2d 44.

4 Respondent's brief refers to a memorandum submitted to the committee by Mr. Henry F. Butler, representing the National Council on Naturalization and Citizenship, in which he suggested that the word "voluntarily" be inserted at the beginning of subsection (c). It seems to us that the failure of the committee to accept this amendment is of little significance in view of the legislative history above referred to indicating that such amendment was unnecessary and superfluous.

When H.R. 9980 reached the Senate, it was referred to the Senate Committee on Immigration. That committee reported the bill back to the Senate with several amendments, two of which we shall mention briefly. 86 Cong.Rec.12,817. One amendment added to § 401(c) of the House bill the phrase, "if he has or acquires the nationality of such foreign state", so that the subsection was made to read as it now appears in the Act, being applicable only to dual nationality cases. The other amendment added a new subsection (c) to § 317 so as to provide that a person who shall have lost his citizenship under the provisions of § 401(c) might regain his citizenship by an accelerated and simplified naturalization procedure (see 54 Stat. 1146–1147, 8 U.S.C.A. § 717(c)). No explanation of these amendments was made either in the Senate committee report (Sen.Rep.No.2150, 76th Cong., 3d Sess. (1940)) or on the floor of the Senate. The legislative history of the bill in its progress through the House had indicated clearly enough that § 401(c) was not interpreted as applying to cases where the service in the foreign army was under duress. There was no suggestion in the Senate that the subsection was there understood differently or that the Senate amendment limiting the application of the subsection to cases of dual nationality was intended to make the amended subsection applicable whether the army service was voluntary or under duress. The phrase "entering, or serving in, the armed forces of a foreign state" remained as it had been in the draft code and in the House bill. The Senate committee amendments were agreed to and the bill as amended was passed by the Senate without debate.

The committee of conference between the two Houses speedily reached an agreement. 86 Cong.Rec.13,244. The two Senate amendments above referred to were accepted by the House. With reference to the amendment to § 401(c), the conference report stated: "The House bill provided that a national of the United States should lose his nationality by entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States. The Senate amendment provided that he should lose his United States nationality in such a case only if he has or acquires the nationality of the foreign state. The House recedes."

When the conference report came before the House, Mr. Rees, one of the managers on the part of the House, made certain statements which the court below took to indicate a legislative intent that § 401(c) was applicable whether the service in the foreign army was voluntary or under duress. See 86 Cong.Rec.13,246–13,248, 13,250. The colloquies referred to did not have reference directly to § 401(c) but were elucidating the purpose and operation of the Senate amendment to § 317 whereby a person who had lost his nationality under § 401(c) was enabled to reacquire it by a simplified naturalization procedure. At several places Mr. Rees refers to the case of an American citizen of dual nationality who "joins" the army of a foreign state, and thereby loses his American nationality under § 401(c). Such a person, Mr. Rees pointed out, got the benefit of the expedited naturalization procedure inserted in the bill by the Senate amendment. Mr. Rees, in using the word "joins", was paraphrasing § 401(c). He was not addressing himself to the question whether "entering" implied a voluntary act as distinguished from being drafted—the discussion was not focused on that point at all. The paraphrase used by Mr.Rees—"joins"—is susceptible of implying a voluntary act in contrast to induction under duress.

At no time during the course of the bill through the two Houses of Congress was there any suggestion that Congress intended the language in § 401(c), "entering, or serving in, the armed forces of a foreign state", to be read in any different sense from that attributed to it in the explanatory notes of the Cabinet committee which prepared and submitted the draft code. Certainly, without undue straining, the word "entering" may be taken as implying a voluntary act. In ordinary parlance there is a difference between entering a room and being pulled or pushed in, though in each case the end result is the same: you find yourself in the room. The other phrase, "serving in", does not, per-

haps, so clearly exclude the idea of duress. But as the explanatory comment of the Cabinet committee made clear, the phrase "serving in" was intended to apply "to the case of one who had entered the army of a foreign state before attaining the age of majority but who, after reaching such age, had continued to serve ·in it." In other words, "entering" was the key word in § 401(c) of the draft code. At the very least, the language of the subsection may be said to be ambiguous. "Rights of citizenship are not to be destroyed by an ambiguity." Perkins v. Elg, 1939, 307 U.S. 325, 337, 59 S.Ct. 884, 83 L.Ed. 1320.

For these reasons we think that the district court erred in discharging the writ of habeas corpus. Camara, being still an American citizen, was entitled to be released from custody.[5]

The order of the District Court is vacated and the case is remanded to that court for further proceedings in conformity with this opinion.

### On Petition for Rehearing.

The government has filed a petition for rehearing in which it is earnestly contended that our previous opinion erroneously construed § 401(c) of the Nationality Act of 1940, 8 U.S.C.A. § 801(c). However, the petition does not point to any error in our detailed recital of the legislative history; nor does it bring to light any sig-

nificant matter overlooked by us. Upon full reconsideration, we conclude that we should adhere to our previously expressed view.

In footnote 2 to our opinion, we quoted part of the explanatory comment by the Cabinet committee upon proviso (2) to § 401 of the draft code to the effect that no national under 18 years of age can expatriate himself under subsections (b) to (h) inclusive. The quoted portion of the comment was as follows:

"The reasons for adopting this provision are obvious. It does not seem reasonable that an immature person should be able to expatriate himself by any act of his own. * * * It will be observed that in this subsection the age below which a person cannot expatriate himself is set at 18 years, instead of 21 years. It is believed that a person who has reached the age of 18 years should be able to appreciate fully the seriousness of any act of expatriation on his part. * * *"

It is pointed out by the government that we omitted to quote, the concluding sentence of the comment:

"Moreover, in time of war, young men are frequently accepted for military service before they have reached the age of 21 years, and, under the laws of some foreign countries, males become liable for the performance of involuntary military service when they reach the age of 18 years."

---

[5] Respondent does not suggest that any provision of the Act other than § 401 (c) might be applicable to deprive Camara of his citizenship. Section 401 (a) provides that a person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by "(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person: Provided, however, That nationality shall not be lost as a result of the naturalization of a parent unless and until the child shall have attained the age of twenty-three years without acquiring permanent residence in the United States * * *." This does not apply to Camara because his father was never naturalized in Portugal; he was a native-born citizen of Portugal, and remained such throughout. Whether, apart from this, § 401 (a) would otherwise be applicable in the circumstances of the present case, we need not inquire.

Section 402, 8 U.S.C.A. § 802, would seem to be applicable to Camara. But that section merely provides that residence for six months or longer in a foreign state in the circumstances stated raises a "presumption" that the person has "expatriated himself" under § 401(c) or (d). On the facts in the present record, Camara has overcome the presumption that he had "expatriated himself" under § 401 (c). As to § 401(d), referring to accepting employment under the government of a foreign state in a post to which "only nationals of such state are eligible", Camara's uncontradicted testimony before the Board of Inquiry was that, aside from his enforced military service, he had never had "any job with the Portuguese government in the Azores or anywhere else."

The suggestion apparently is that this concluding sentence in the comment indicates an intention on the part of the Cabinet committee that, under § 401(c) of the draft code, a national over 18 years of age should lose his citizenship by service in a foreign army, whether such service is voluntary or involuntary. The trouble with this suggestion is that it is flatly contradictory to the explicit comment of the Cabinet committee upon § 401(c) of the draft code. The Cabinet committee stated that § 401(c) was based upon the theory that an American national who, after reaching the age of majority, *"voluntarily* enters, or continues to serve in, the army of a foreign state, thus offering his all in support of such state, should be deemed to have transferred his allegiance to it." (Italics added.)

There is not the slightest doubt that, during the course of the hearings before the House committee, the language in § 401(c) of the draft code, "Entering, or serving in, the armed forces of a foreign state", was understood to refer only to voluntary service. The very language of the amendment which Mr. Flournoy of the State Department unsuccessfully urged the House committee to adopt was based upon this assumption. He proposed that a proviso be added to subsection (c) to the effect that, if a person who has acquired American nationality at birth also has the nationality of a foreign state, "his entry into the armed forces of such foreign state shall be conclusively presumed to be voluntary." This phraseology in terms of a conclusive presumption is explicable only on the assumption that the language of § 401(c), except in the case covered by the suggested proviso, referred only to voluntary induction. Mr. Flournoy repeatedly urged his proposal during the course of the House hearings. The proposal, however, was opposed by the Labor Department, whose representative at the hearing maintained that, in all cases, an American citizen, whether or not some other country also had a claim to his allegiance, should be permitted to establish that his service in the foreign army was in fact not voluntary. The committee declined to adopt Mr. Flournoy's amendment. Though there is no reference in the House committee report to this conflict of view between the two departments, we can only infer that the Labor Department's view prevailed with the committee. The bill as it passed the House contained § 401(c) just as it appeared in the draft code submitted by the Cabinet committee, without any amendment. As explained at length in our opinion, the phrase in § 401(c) of the bill as it passed the House, "Entering, or serving in, the armed forces of a foreign state", undoubtedly was not intended to cover a case of involuntary conscription into a foreign army.

Mr. Flournoy did not succeed in getting the House to provide that an American citizen of dual nationality should automatically lose his American citizenship by service in the armed forces of the other country, even though such service was under duress. Did he succeed any better with the Senate? In our previous opinion we traced the subsequent history of the bill, in the Senate committee, on the floor of the Senate, in the conference report, and in the action by the two Houses on the report of the conference committee. The Senate added to § 401(c) of the House bill the phrase "if he has or acquires the nationality of such foreign state", thus limiting the applicability of the subsection to dual nationality cases only. But the Senate left unchanged the introductory phrase, "Entering, or serving in, the armed forces of a foreign state". The government's argument comes to this: that the connotation of this phrase which it undoubtedly had in the bill as it passed the House somehow became enlarged so as to cover cases of involuntary as well as voluntary induction as a result of the Senate amendment which, on its face, did no more than narrow the applicability of § 401(c). If such was the purpose of the Senate amendment, if Mr. Flournoy succeeded in persuading the Senate where he had failed to persuade the House, it is indeed surprising that no reference to any such significant change can be found in the Senate report, in the discussion on the Senate floor when the Senate committee amendments were put to a vote, in the conference report, or in the discussion on the

floor of the House when the report of the conference committee was adopted.

The government urges that we failed to apprehend the significance of the Senate amendment adding a new subsection (c) to § 317, 8 U.S.C.A. § 717(c), so as to provide that a person who loses his citizenship under the provision of § 401(c) might regain such citizenship by an accelerated and simplified naturalization procedure. It points out that if an American citizen loses his citizenship under § 401(b) by taking an oath or making other formal declaration of allegiance to a foreign state, or if he loses his citizenship under § 401(d) by accepting employment under the government of a foreign state of a sort for which only nationals of such state are eligible, such expatriated person·must start from scratch as an alien and come to the United States only under the quota of the foreign country and, after admission to the United States, wait the usual five years before achieving naturalization. Therefore, the argument runs, there would be no point in the provision of § 317(c) affording an accelerated naturalization procedure to persons who lost their citizenship under § 401(c) "except to provide for those who lost their citizenship by serving in the armed forces of a foreign state involuntarily." This argument overlooks the fact that, under § 401(c), an American national who is also a national of a foreign state undoubtedly loses his American citizenship by *voluntary* enlistment in the armed forces of such foreign state. Yet, under § 317(c), such a person obtains the benefit of the simplified naturalization procedure in consequence of § 317(c). Why the Congress chose to afford this boon to a person who did a voluntary act of expatriation under § 401(c), and not to a person who did a voluntary act of expatriation under § 401(b) or § 401(d), is nowhere explained in the legislative history of the Act.

In footnote 5 of our previous opinion, we noted the point that the government had not relied on § 402, 8 U.S. C.A. § 802, as lending any support to its contention that Camara had lost his citi-zenship. That section provides that a national of the United States who was born in the United States "shall be presumed to have expatriated himself under subsection (c) or (d) of section 401, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state, * * * and such presumption shall exist until overcome whether or not the individual has returned to the United States." The government now urges, in its petition for rehearing, that Camara's "expatriation became absolute under Section 402 because he entered the foreign army, thereby expatriating himself under subsection (c), and consequently is not in a position to overcome the presumption by proof that he did not serve in the foreign army." This argument obviously begs the question whether § 401(c) is applicable to a case of involuntary conscription into the foreign army. Section 402 creates only a rebuttable presumption, and it does not enlarge the content of § 401(c). Furthermore, the language of § 402—"shall be presumed to have *expatriated himself* under subsection (c) or (d) of section 401"—furnishes strong support for our interpretation of § 401(c). To "expatriate" oneself clearly implies voluntary action. "Expatriation is the voluntary renunciation or abandonment of nationality and allegiance." Perkins v. Elg, 1939, 307 U.S. 325, 334, 59 S.Ct. 884, 889, 83 L.Ed. 1320. In this case Camara certainly overcame any presumption that he had voluntarily renounced or abandoned his American nationality and allegiance.

Giving full weight to the government's contentions, it certainly cannot be said that the interpretation of § 401(c) urged by the government is the only permissible one in view of the statutory language in the context of its legislative history. We repeat the admonition of Perkins v. Elg, supra, at page 337 of 307 U.S., at page 891 of 59 S.Ct., 83 L.Ed. 1320: "Rights of citizenship are not to be destroyed by an ambiguity." The interpretation we have been constrained to adopt avoids the necessity of passing on the pow-

er of Congress to deprive a native-born American citizen of his nationality under the circumstances here presented.

The petition for rehearing is denied.