**ZIMMER et al. v. ACHESON, U. S. Secretary of State.**

No. 6375.

United States District Court, D. Kansas.

June 30, 1950.

A. B. Mitchell and Nicholas F. Lopes, Lawrence, Kan., for plaintiffs.

Lester Luther, United States Attorney, and Philip A. Dergance, and Eugene W. Davis, Assistant United States Attorneys, all of Topeka, Kan., for defendant.

MELLOTT, Chief Judge.

In this proceeding a father and his nine year old daughter, both of whom were born in Germany, seek decree declaring each to be a national and a citizen of the United States of America. The status of the daughter is dependent upon the citizenship of the father at the time of her birth. Necessary findings with reference to her will be made; but, unless otherwise indicated, throughout the findings and discussion, Harry Ward Zimmer will be referred to as the petitioner.

### Findings of Fact

1. Petitioner, at the time of the filing of the complaint and at the time of the hearing, was "staying with" [1] his brother in Lawrence, Douglas County, Kansas. His principal occupation has been manufacturing china; but, at the times mentioned above, he was unemployed.

2. Petitioner was born in Coburg, Bavaria (Germany), August 9, 1905. His daughter, Ilona Marga, was born in ——, Germany, July 22, 1940. The wife of petitioner—who died January 13, 1946 at Hof, Bavaria—was a citizen of Germany at the time of her marriage to petitioner on June 15, 1939, and was never naturalized as a citizen of the United States.

3. Petitioner's father, Werner Hermann Zimmer, was born in Gera, Thuringia (Germany), in 1867. He came to the United States during the nineties (sometime after January 1, 1890) and, at a time not disclosed by the evidence, was united in marriage to Nellie M. Lang, who had been born in Wheeling, West Virginia, on July 18, 1867. Werner Hermann Zimmer was naturalized in the Circuit Court of Ohio County, at Wheeling, West Virginia, on October 30, 1896. In 1901 he returned to Germany—probably accompanied by his wife although the record only inferentially so shows—to visit his father, who was then ill.[2] He accepted employment in Germany,

---

1. The innocuous words "staying with" are used to avoid any implication from the use of "residing," "domiciled" or similar expressions.

2. This is established only by the hearsay testimony of petitioner, who was born four years after his parents took up their abode in Germany.

first as the editor of a paper specializing in news for the ceramic industry and later with the Haviland China Co.[2] He resided in Germany continuously from 1901 until the time of his death in 1933.

4. The mother of petitioner—wife, and later, widow of Werner Hermann Zimmer—made her home in Germany until, and after, the death of her husband. She died in 1947. During the period between 1901 and her death she visited relatives in the United States on several different occasions. In the summer of 1908 she and her husband brought petitioner—who, at that time, was three years of age—to the United States on a visit. The husband returned to Germany earlier; but petitioner and his mother spent several months with her relatives in Wheeling, West Virginia. After this visit, petitioner returned to Germany early in 1909, where he was educated, grew to manhood and resided continuously—possibly one additional visit was made to the United States in 1911—until the year 1925.

5. In the summer of 1925 petitioner, while a student in the University of Wursburg in Bavaria, made a vacation trip to the United States to visit his relatives. He returned to Germany in the fall, resumed his studies at, and was later graduated from, the university, and continued to reside in Germany for the next eight (8) years, i. e., until 1933.

6. At an undisclosed time petitioner's father had registered with the American (United States) Consul General at Coburg, Germany, as an American (United States) citizen. Some passports—the number is not shown—appear to have been issued to him as a citizen of the United States.

7. In November, 1933, petitioner and his mother made a trip to the United States, visiting relatives in West Virginia and Lawrence, Kansas, and returning to Germany in January, 1934.

8. In the late fall of 1934, petitioner made another trip to the United States, spending several weeks with his brother at Lawrence, Kansas. Some time was also spent in the Wheeling, West Virginia, area where petitioner unsuccessfully sought employment. He returned to Germany in August, 1935. Apparently a passport, in connection with this trip, was obtained from the United States Consul General at Munich, Germany.

9. In September, 1938, petitioner made his final trip, before World War II, to the United States, for the purpose of visiting his relatives. On October 4, 1938, he called in person at the office of the clerk of United States District Court at Wheeling, West Virginia, and applied for a passport to visit Germany on business. It was stated therein that he intended to return to the United States within two (2) years. He took the oath of allegiance to the United States and signed an affidavit swearing that: "* * * if I am issued the Passport for which I am making application and of which this affidavit is a part, I will not, during the validity of the Passport, or during the validity of any renewal or extension thereof, enter any foreign military or naval service without first obtaining the permission of the United States Government."

The passport so obtained was used to return to Germany and apparently could have been used by him to return to the United States at the time, or before, he was drafted into the German Army, as hereinafter related.

10. During February or March of 1940, petitioner received, in Germany, notice to appear before a local German draft board, the notice advising him he "was under martial law." He reported, was examined and subsequently, on June 11, 1940, began active duty in the German Army. He served in the German Army until the United States forces came in and took over in May, 1945, at which time he was a corporal. Captured and held as a war prisoner, he was subsequently released.

11. At the time petitioner was examined for the draft he informed the examiners he was an American citizen. He was advised they regarded him as a German citizen and he was directed "to stay in line."[3] He did

---

2. This is established only by the hearsay testmiony of petitioner, who was born fours years after his parents took up their abode in Germany.

3. This finding is based upon petitioner's uncorroborated testimony.

so and never reported his dilemma to the Consul General of the United States although the United States, at that time and for eighteen months thereafter, was not at war with Germany.

12. The public law of Germany in 1940 required all soldiers of the Wehrmacht to "take an oath upon their entry into the service." The prescribed oath was:

"In the name of God I swear this sacred oath: that I will unconditionally obey Adolf Hitler, the Fuhrer of the German Reich and people, and the Commander-in-Chief of the Wehrmacht, and will be willing as a brave soldier to sacrifice my life at any time for this oath."[4]

13. After the cessation of hostilities in Germany, petitioner, on or about April 4, 1947, made application to the Vice-Consul of the United States at Munich, Germany, for passports for himself and daughter as citizens and nationals of the United States. The application was denied on the ground that petitioner had "expatriated himself by taking the oath of allegiance to Germany, a foreign country."

### Ultimate Finding and Conclusion

1. Petitioner was a citizen and national of Germany on and prior to the birth of his daughter Ilona Marga Zimmer on July 22, 1940, and she has been a citizen and national of Germany since her birth.

### Opinion

Title 8 U.S.C.A. § 903,[5] a portion of which is set out in the margin, gives this court jurisdiction, petitioner obviously claiming a permanent residence in this dis-

trict. Whether the Declaratory Judgment Act,[6] which was in force at the time the complaint was filed and upon which petitioner also relies, is applicable, need not be determined.[7]

The issue before the court, as it has been presented, is predominantly one of fact, although it is perhaps more accurate to say it is one of fact and law. Petitioner undertook to show that he was, and remained, a citizen and national of the United States before, at, and subsequent to the birth of his daughter and that both of them are entitled to all of the rights and privileges appertaining thereto. The findings which have been made, including the ultimate finding and conclusion, are dispositive of the controversy. While it is always difficult, and rarely advisable, to attempt rationalization of an ultimate finding, a brief summarization of the evidence upon which the present one rests may not be amiss.

At the inception of the controversy, petitioner submitted to the Consul General of the United States at Munich, Germany, an affidavit in which he expressed the conclusion he "became a citizen of the United States by birth through * * * [his] father * * * who was a naturalized citizen of the United States." Apparently the vice-consul was willing to accept that premise; but, as shown in Finding 13, concluded petitioner had expatriated himself by taking the oath of allegiance to Germany, a foreign country. He reached that conclusion in spite of petitioner's statement in the affidavit to the effect that "the oath of allegiance was required of my training

4. The evidence pertaining to the taking, or the failure to take, of the prescribed oath will be referred to in the opinion.

5. Act of October 14, 1940, c. 876, 54 Stat. 1137, 1171, "If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency

in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. * * *"

6. Title 28 U.S.C.A. § 400, repealed by Act of June 25, 1948, c. 646, § 39, 62 Stat. 992, new title 28 U.S.C.A. §§ 2201, 2202.

7. Cf. Schioler v. United States, D.C., 75 F.Supp. 353; Dos Reis ex rel. Camara v. Nicolls, D.C., 68 F.Supp. 773; Id., 1 Cir., 161 F.2d 860.

group but I was not present and did not take the oath; of this, however, I am unable to produce proof." The vice-consul held that "in the absence of any proof to the contrary it is assumed that he was required to take the oath of allegiance."

The soundness of the conclusion reached by the vice-consul need not be passed upon. At the hearing, petitioner took an entirely different position. He testified that after he had been transported to East Prussia, some 500 miles from his home, and outfitted, the men of his company and another, comprising altogether some 500, were formed into a hollow square and the oath was administered to them; that he was in the rear row; that he neither held up his hand nor repeated the oath in response to the command to do so; and that he never, at any time, took the required oath or any other.

The evidence relied upon taxes the credulity of the court. It is difficult to believe petitioner refrained from holding up his hand and repeating the oath; but, even if he did so, it is doubtful if conclusion should be reached he was not bound by the oath. As shown in Finding 11, he did nothing to prevent his induction into the German Army other than to inform the administrative officers that he claimed to be a citizen of the United States. He was a well-educated man, having been graduated from the University of Wursburg, and spoke both German and English fluently. He had been to the United States consulate previously, evidently knew the extent of its powers, the United States was not then at war with Germany, and he had in his possession a passport entitling him to go to the United States, if he desired to do so. He never reported his dilemma to the consul or vice-consul nor did he take any action in the courts or other tribunals of Germany to assert his rights. He gave no open evidence, either at the time of his induction into the German Army or at the time the oath was administered to his company, that he did not desire to take the oath. He continued to serve in the German Army, apparently without any reluctance or protest, for a period of almost five years, receiving two promotions and being, at the time of the termination of his service, a non-commissioned officer. Under the circumstances, therefore, it is difficult to believe he did not voluntarily renounce or abandon such nationality and allegiance as he then had or owed to the United States. Thus this court believes that there had been an "expatriation," as that term is defined by the Supreme Court in Perkins v. Elg [8] and as applied by the Court of Appeals for the First Circuit in the Dos Reis case, cited in footnote 7.

As to the voluntariness of petitioner's service and the question of duress, about all the court has is petitioner's unsupported testimony. He testified that when they started examining him at the draft board he said:

" * * * 'Well, I am an American citizen' and the answer I got was 'on the record you are a German citizen and that doesn't concern you. You don't have to bother about that, and just go—step into the file and go ahead.'" His statement that he was going to "see about that wasn't taken serious or anything" and they told him: "You are a German national and we have you under guard so you can't go to the Consul." After the examination he went back home and "talked it over with my wife and she was hesitant because I don't know what to do; I am afraid, something to happen and expecting a baby, perhaps the best thing is not to do anything, the war wouldn't last long and * * *".

"Q. (Interrupting) What do you mean you were afraid? What do you mean by afraid? That you were afraid? A. Well, to get in contact with the Gestapo.

"Q. Did you have any contact with the Gestapo or any other agents of the state? A. Well, a few days later. I can't swear to it that they were men of the Gestapo, but at least they were from the official agency of the state and they came to my house one evening and wanted to speak to me and told me in brief words that I was considered absolutely as a German citizen

8. 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320.

and it was no use of one applying to the American Consul.

"Q. What else did they tell you? A. That in case I should do (sic) there were reprisals not only against myself but also against my family."

He also testified that the agents made reference to concentration camps where there was room for him to "think it over." This was the substance of petitioner's testimony upon direct examination pertaining to duress. Under cross-examination, in response to a question as to why he did not "take the trouble to go over to see the American Consul about it," petitioner stated he "was afraid at that time."

"Q. Even though you were claiming to be an American citizen you didn't, after you received a notice to report to the draft board, communicate with any of the American officials such as the Consul? A. No, because I expected when I (sic) going there and tell (sic) that would be sufficient.

"Q. Well, you had an opportunity if you wished to go over and talk to the American Consul about it, didn't you? A. Might have the opportunity but as I had the visit already before and was warned to be careful what I was doing I rather wanted to wait until the actual day was set.

\*     \*     \*     \*     \*     \*

"Q. As an American citizen were you afraid to go see the American Consul? A. They considered me as a German citizen and said I was under martial law, so I didn't want to endanger my family.

"Q. Well, as an American citizen, weren't you afraid to go into the German Army? A. Why should I be afraid?

\*     \*     \*     \*     \*     \*

"Q. Now, Mr. Zimmer, as a matter of fact, you really thought you were sort of a —in a dual citizenship capacity, didn't you? A. Yes."

Petitioner's situation was, no doubt, fraught with some difficulty. Born in Germany, son of a father born in that country, educated in its schools, married there to a German woman and actually having resided there all of his life, except for brief visits to the United States, it is not surprising he was thought to be subject to military service in that country. Indeed, even he seems to have acquiesced in the view he was a citizen of that country and obligated to render such service; and, in spite of his pledge not to do so "without first obtaining the permission of the United States Government," he began such service at a time when he thought "the war wouldn't last long," months before the United States entered the war. While this court is not unmindful of the existence and activity of the Gestapo, it is not convinced that organization played any substantial part in petitioner's induction into the German Army. The proof falls far short of establishing that it, or any other agency of the German government, forced petitioner to serve in the German Army. The court has, therefore, concluded that he voluntarily, and without any duress, entered such service. Having done so, he, in this court's studied judgment, elected to renounce, and effectively did renounce, his citizenship in the United States.

So far the court has adopted the postulate of petitioner and his counsel that petitioner "became a citizen of the United States through birth, his father, at that time, being a naturalized citizen of that country." While there are some circumstances supporting that assumption, there are others casting substantial doubt as to its correctness. In the first category are the registration with the United States consul in Germany as a citizen of the United States, the issuance of passports to him as such a citizen and the lack of evidence showing he had taken any affirmative action voluntarily expatriating himself or indicating that he did not desire to retain the status of an American citizen but to preserve, or restore, his allegiance to Germany. In the other category, however, is the circumstance that petitioner was born in Germany more than four years after his parents had obviously elected to make that country their permanent place of abode, that he chose to continue to reside there for fourteen (14) years after he attained his majority, he being thirty-five (35) years of age at the time of his induction into military service, and that he

318

had such doubt as to whether he was a citizen of the United States or of Germany that he elected to serve in the German Army rather than to make an issue about his citizenship. In this connection he evidently took the view he could continue, indefinitely, to be a citizen of both countries.

At the risk of supererrogation, the court expresses substantial doubt that Werner Hermann Zimmer was a citizen of the United States at the time of petitioner's birth. As indicated above, shortly after being naturalized he returned to Germany, accepted employment as the editor of a newspaper devoted to what was apparently his life's work, viz., the ceramic industry, resided there continuously until his death and obviously elected to make that country his place of permanent abode. The suggestion that he was a citizen of the United States, temporarily residing in Germany for the purpose of representing an American corporation, rests upon speculation and inference at best. No evidence establishing that as a fact was adduced. The record merely shows, as set out in Finding No. 3, that after being employed for a while as the editor of a newspaper specializing in news for the ceramic industry he became connected with the Haviland China Co. and that he continued to reside in Germany from 1901 until his death in 1933.

Upon briefs, and at the hearing, learned counsel for petitioner and for the government espoused conflicting views as to the presumptions which should be made by the court and as to which side had the burden of establishing, by the evidence, the status of Werner Hermann Zimmer at the time of petitioner's birth in 1905. Neither side assumed either the burden of proof or the burden of going forward with the evidence. Counsel for the government did, however, call the court's attention to Section 7 of Title 8 of the United States Code Annotated[9] as it existed prior to amendment by the Nationality Act of 1940. This section is recognized by counsel for the petitioner as being a "uniform rule or regulation of expatriation * * * written into law" in 1907; but argument is made it could have no retroactive effect upon Werner Hermann Zimmer's citizenship and therefore the court should conclude he was a citizen of the United States at the time of petitioner's birth. But, urges counsel for the respondent, Werner Hermann Zimmer must be held to have "renounced his naturalization in the United States" under Article IV of the Treaty signed at Berlin on February 22, 1868 between the North German Confederation and the United States, 15 Stat. 616,[10] by renewing "his residence in North Germany, without the intent to return to America," the intent not to return being drawn, as provided in the concluding sentence of the quotation, from the fact that he had resided more than two years in Germany.

9. "Any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws or when he has taken an oath of allegiance to any foreign state. When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state, it shall be presumed that he has ceased to be an American citizen and the place of his general abode shall be deemed his place of residence during the said years. Such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States under such rules and regulations as the Department of State may prescribe. Duplicates of any evidence, registration or other acts required by this section shall be filed with the Department of State for record." (P. 28, Record of Trial.)

10. "If a German naturalized in America renews his residence in North Germany, without the intent to return to America, he shall be held to have renounced his naturalization in the United States. Reciprocally: if an American naturalized in North Germany renews his residence in the United States, without the intent to return to North Germany, he shall be held to have renounced his naturalization in North Germany. The intent not to return may be held to exist when the person naturalized in the one country resides more than two years in the other country." (P. 5, Defendant's Brief.)

As indicated above, there is but slight evidence upon which this court can make a finding or hazard a conclusion. It leaves this phase of the matter as it began, i. e., by reiterating its doubt as to the citizenship of petitioner's father at the time of his birth.

But even if it be assumed petitioner acquired United States citizenship upon his birth to parents temporarily absent from the United States, whether he thus secured "dual nationality"—which is probable—or is to be classed as a "natural born" citizen of the United States, he was not, upon attaining his majority, in a more favorable situation than was petitioner Elg in Perkins v. Elg, supra, or Steinkauler, the brothers Boisseliers Jacob Bohn and the others mentioned therein. Each, it was pointed out in the rulings, should, when he reached the age of twenty-one then elect whether he would return and take the nationality of his birth, with its duties and privileges, or retain the nationality acquired by the act of his father in taking him to another country. "(T)he principle which permits * * * [an] election [by a native citizen removed to his parent's country of origin during minority, to return on his majority and maintain his citizenship] conserves and applies [the right of expatriation]." Petitioner was thirty-five years of age when drafted into the German Army. Fourteen years had therefore elapsed after he attained his majority without any evidence of an election to maintain his citizenship in the United States, save only the promise, promptly broken, made in October, 1938, as indicated in Finding No. 9.

Recent cases tending to support the conclusion this court has reached that petitioner was a citizen and national of Germany on July 22, 1950 are shown in the margin.[11] Podea v. Acheson,[12] called to the court's attention in a memorandum recently submitted by counsel for petitioner, applies the rationale of Dos Reis ex rel. Camara, supra;

but those cases, the court believes, are distinguishable upon their facts.

Appropriate order, making effective the court's views, should be prepared by counsel for the respondent. Settle in accordance with the Federal Rules of Civil Procedure, 28 U.S.C.A., and this court's Rules of Practice.

11. Cantoni v. Acheson, D.C., 88 F.Supp. 576; Kazdy-Reich v. Marshall, D.C., 88 F.Supp. 787; and Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292.

