**AKIO KUWAHARA v. ACHESON, Secretary of State.**

No. 10095(f).

United States District Court
S. D. California, Central Division.

March 5, 1951.

A. L. Wirin and Fred Okrand, Los Angeles, Cal., for plaintiff.

Ernest A. Tolin, U. S. Atty., and Arline Martin and Robert K. Grean, Asst. U. S. Attys., Los Angeles, Cal., for defendant.

BYRNE, District Judge.

Plaintiff, Akio Kuwahara, was born an American national of Japanese ancestry in the State of Wyoming on November 30, 1925. At the age of five years he was sent to Japan by his parents to attend school. At the outbreak of our recent war with Japan he was sixteen years of age and attending what would be comparable to high school in this country. Upon completion of his schooling he worked as a civilian employee in a clerical capacity with the Japanese military forces until the surrender. (He testified that he accepted this position to avoid draft in the armed forces.)

Following the surrender, the plaintiff worked on a farm, and from March, 1947 until February, 1948 he was an employee of the occupation forces commanded by General MacArthur. In April, 1946 and April, 1947 he voted in the general elections in Japan. On February 16, 1949 the plaintiff filed an application for a passport for return to the United States, and sought to be registered as a citizen of the United States at the office of the United States Consul. The requests for passport and registration were refused and the Department of State issued to the plaintiff a "Certificate of the Loss of the Nationality of the United States", which action was based on the ground that he had voted in the Japanese elections of 1946 and 1947 in contravention of Section 401(e) of the Nationality Act of 1940, 8 U.S.C.A. § 801(e), which provides: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (e) Voting in a political election in a foreign state * * *."

Thereupon the plaintiff brought this action, pursuant to the provisions of Section 903 of Title 8 United States Code Annotated, seeking a judgment declaring him to be a national of the United States.

Three issues are tendered:

1. Was Japan a foreign state at the time the plaintiff voted?

2. Were the elections or either of them political elections?

3. When the plaintiff voted were his actions voluntary?

1. *Was Japan a Foreign State at the Time the Plaintiff Voted?*

■■■■ Plaintiff contends that the nature of the allied occupation of Japan evidences that Japan is no longer a state, his theory being that a state cannot exist where occupying forces wield so much power as is wielded by the present allied occupation forces. To buttress this contention, the plaintiff quotes extensively from various directives of the Supreme Commander for the Allied Powers and, from publications of the Department of State, all for the purpose of showing that the sovereignty of Japan was limited by the domination of the occupying powers.

Incidentally, it might be mentioned here that nowhere in any of these publications does there appear any direct statement that the Government of the United States does not consider Japan to be a foreign state.

The defendant, on the other hand, argues that Japan is under military occupation and cites authorities to the effect that military occupation does not destroy a state; that a state continues to exist until it is extinguished by absorption or dissolution.

All of these contentions are designed to aid this court in making an independent determination of the question of whether or not Japan is a foreign state based on the conditions which exist in that country. Such an independent determination is not required of the court, as it is a fact of which the court may take judicial notice. "Whether a Court will take judicial notice of the *existence of a foreign State,* or the legitimacy of a *foreign government,* is really a question whether, as a matter of substantive law and judicial functions, a foreign State or government will in domestic Courts be treated as existing only so far as the Executive so treats it. Here it is conceded that the *Executive's recognition* is the determining element." Wigmore on Evidence, third edition, Vol. IX, Section 2566.

The court is bound by the determination of the Executive Department as to whether or not Japan was a "foreign state" at the time the plaintiff voted in the elections of Japan, and may not make an independent determination on the basis of evidence introduced at the trial relating to the manner in which such government is conducted. Jones v. United States, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691; Williams v. Suffolk Insurance Co., 13 Pet. 415, 10 L.Ed. 226.

The proper application of the rule is found in Jones v. United States, supra, 137 U.S. at page 216, 11 S.Ct. at page 85: "In the ascertainment of any facts of which they are bound to take judicial notice, as in the decision of matters of law which it is their office to know, the judges may refresh their memory and inform their conscience from such sources as they deem most trustworthy. * * * As to international affairs, such as the recognition of a foreign government, or of the diplomatic character of a person claiming to be its representative, they may inquire of the foreign office or the department of state. * * *"

The Government of the United States, prior to the outbreak of war with Japan on December 7, 1941, recognized Japan as a "foreign state" and has continued to do so to the present time. This court is bound by that recognition.

■■■■ To hold that Japan is not a foreign state is to say that a citizen of the United States may not only vote with impunity in Japanese elections, but also without loss of citizenship apply for and obtain naturalization in Japan, see Sec. 801(a); take an oath of allegiance to Japan, see Sec. 801(b); accept an office in the government of Japan, see Sec. 801(d); make a formal renunciation of his United States citizenship in Japan, see Sec. 801(f). Surely

Congress could not have intended that such actions, if voluntarily done, would leave United States citizenship unaffected.

**2.** *What is a "Political Election" Within the Meaning of Section 401(e) of the Nationality Act of 1940?*

■ There appears to be nothing in the legislative history of the Act which gives a precise definition to these words. The term, "political election" in this section of the statute has caused considerable confusion, and has received varying interpretations. Under such circumstances, we may presume that the words were intended to have their ordinary and usual meaning, unless it appears that they were intended to have a special meaning. In Webster's New International Dictionary (Unabridged), second edition, 1949, "election" is defined as follows: "1. Act of choosing; choice. 2. Act of choosing by vote a person to fill an office, or to membership in a society, as by ballot, uplifted hands, or viva voce; as the election of a president or a mayor; hence, the regular exercise of its function by an electorate. * * *"

In the same volume the word "political" is defined as follows: "Of or pertaining to polity, or politics, or the conduct of government, referring in the widest application to the judicial, executive, and legislative branches; of or pertaining to, or incidental to, the exercise of the functions vested in those charged with the conduct of government; relating to the management of affairs of state; as, *political* theories. * * *"

■ Thus, a "political election" may be defined as the act of choosing by vote a person to fill an office, which office pertains to the conduct of government. With this definition in mind we may proceed to examine the legislative history of the Act to see if there is anything there which shows that a different meaning was intended. The Nationality Act of 1940, 8 U.S.C.A. § 501 et seq., was drafted by a committee of advisors appointed by the Secretary of State, Secretary of Labor, and the Attorney General, pursuant to Executive Order No. 6115 of April 25, 1933. On June 1, 1938 these cabinet officers made a report to the President, which the President in turn submitted to the Congress on June 13, 1938. The following is the committee's explanatory comment on Section 401(e): "The meaning of this subsection also seems clear. It is applicable to any case of an American who votes in a political election in a foreign state, whether or not he is a national thereof. Taking an active part in the political affairs of a foreign state by voting in a political election therein is believed to involve a political attachment and practical allegiance thereto which is inconsistent with continued allegiance to the United States, whether or not the person in question has or acquires the nationality of the foreign state. In any event, it is not believed that an American national should be permitted to participate in the political affairs of a foreign state and at the same time retain his American nationality. The two facts would seem to be inconsistent with each other."

■ It should be noted that no special significance was attached to the words, "political election". It seems clear that they were intended to be used in their ordinary sense. The act of voting in a political election in a foreign state meant to the drafters of the Act the taking of "an active part in the political affairs of a foreign state" by voting for persons to fill public office. Applying this criterion to the facts as shown by the evidence, we find that the elections in Japan were "political elections". The plaintiff has testified that he voted for candidates for election to the Diet, which is Japan's legislative body.

The plaintiff contends that the elections were not "political elections" because the Supreme Commander could, and did by directive, dissolve the old Diet and designated the time for holding an election to select a new Diet. The Supreme Commander made it clear that he had the power to dissolve the Diet and call for another election at any time, should the results of the election prove unsatisfactory to the occupying forces. Throughout the campaign allied forces carefully watched its progress to prevent irregularities, and on election day supervised the polling places to prevent fraud, coercion or solicitation at

the polls. And throughout the campaign the occupation forces were active encouraging a heavy turnout on election day and ordained that the women of Japan be permitted to vote for the first time in the history of that country. After the election, General MacArthur approved the results.

From the foregoing and other facts in evidence, it can be seen that the Supreme Commander and his occupation forces exercised a high degree of control over these elections. Likewise it is true that the Supreme Commander was empowered in effect to veto the results by dissolving the newly elected Diet and order a new election. But does this justify a finding that this was not a political election? We think not. The voters were given the power to choose persons to fill offices which pertained to the conduct of the government. That these offices were concerned with governmental activities is apparent. The purpose of the election, to paraphrase General MacArthur, was: "to carry out occupational policy through the utilization of the Japanese government through a functioning legislature to enact new laws required to implement SCAP directives *and to provide for routine government business.*" It might be said that such a legislature is a "rubber-stamp Congress" or a "puppet legislature" but the fact remains that this body, whatever its limitations, had for its purpose the business of governing Japan.

3. *When the Plaintiff Voted were His Actions Voluntary?*

The plaintiff admits he voted in the Japanese elections of 1946 and 1947, but contends his actions were not voluntary.

The Government's contention that it was immaterial whether or not the plaintiff had acted voluntarily was rejected by the court in Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860. The court reviewed the legislative history of the Act and concluded that Congress intended subsection (c), (with which the court was then concerned) applied only to voluntary action. This view has been adopted in all cases dealing with Sec. 801 irrespective of the subsection concerned.

The cases lay down no workable test as to what constitutes voluntary or involuntary action. Perhaps no test can be adopted that will fit all situations. Webster's New International Dictionary (Unabridged) second edition, 1949, defines "voluntary" as follows: "Proceeding from the will, or from one's own choice or full consent; produced in or by an act of choice; as, *voluntary* action. (2) Unconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself or itself; free. * * *"

"Involuntary" is the antonym of "voluntary" and has the opposite meaning.

The question, then, is whether plaintiff's action in voting in the elections was an act of his own choice, unimpelled by the interference or influence of others. In applying this test the quantum of influence which would remove the act from the sphere of "free choice" would vary according to the character of the act. For example, "Committing any act of treason against, or attempting by force to overthrow or bearing arms against the United States * * *" subsection (h), should require a far greater degree of influence or compulsion to justify a finding that it was involuntary than would the act of voting in an election. Likewise, it would seem that being naturalized in a foreign state, subsection (a), or swearing allegiance to a foreign state, subsection (b), or serving in the armed forces of a foreign state, subsection (c), (particularly of an enemy country), or making a formal renunciation of nationality, subsection (f), all are acts which would require a higher degree of pressure than would the act of voting.

The plaintiff testified it was announced over the radio, "This is the first election since the war and everyone should vote." that all would be given a "half day off" for that purpose. That some one told him that "I might lose ration card if I did not vote"; that an Australian soldier stationed where plaintiff worked, speaking through an interpreter, said, "Today is election—you be given half-day off—go to vote".

Standing alone these statements would not constitute duress or coercion, but when considered with the general conditions existing in Japan at the time, they present an entirely different meaning. The evidence depicts a situation in Japan during the years 1946 and 1947 in which the minds of the inhabitants were adjusted to the realization that the occupation authorities were all-powerful and to displease them would result in grave consequences.

On January 12, 1946, General MacArthur told the Japanese Government to hold its first general election "not earlier than March 15" under the new law guaranteeing the vote to women and younger men. Prior to the general elections of April 10th authorized agencies of the Headquarters encouraged the Japanese press, radio and other information dissemination media to encourage election participation by eligible voters. In pre-election reports the press emphasized the election's importance and the imperative need for participation by all voters and declared that the world was watching the Japanese election and that those who refrained from voting were "enemies of the people". The documentary evidence establishes a clear picture of an intensive program carried out by the occupation authorities to stimulate participation in the elections. A public statement by Lieutenant Colonel Ryan, (Plaintiff's Exhibit 12), is typical: "The voters have no right to delegate their power of selection to any small group. If they do this, they are failing to meet their obligations and deserve what may befall them, non-representative government. Let every man and woman who has the vote, exercise that right and make the coming election a truly democratic one."

Such activities on the part of the occupation authorities were, of course, quite proper and unquestionably in the interest of Japan as well as the nations represented by the occupation forces. But consider the effect on people whose lives, minds and habits had, for almost 300 years, been trained to obey the will of a governing few. In the 1946 election, despite the transportation difficulties, more than 27,000,000 people or 73 per cent of the entire electorate cast their votes. It probably would be safe to say that the majority of the remaining 27 per cent were purgees and their associates who wished to defy the occupation authorities. This response of the electorate bears witness to the effectiveness of the pressures upon the people to go to the polls.

The plaintiff says he did not intend to give up his American citizenship and that he did not know that voting in the election would result in such loss. In Savorgnan v. United States, 338 U.S. 491, at page 499, 70 S.Ct. 292, 296, 94 L.Ed. 287, the court said: "The petitioner's principal contention is that she did not intend to give up her American citizenship, although she applied for and accepted Italian citizenship, and that her intent should prevail. However, the acts upon which the statutes expressly condition the consent of our Government to the expatriation of its citizens are stated objectively. There is no suggestion in the statutory language that the effect of the specified overt acts, when voluntarily done, is conditioned upon the undisclosed intent of the person doing them."

An American citizen who has performed one of the overt acts prescribed in Section 801 cannot preserve his citizenship by showing his intent or understanding to have been contrary to the usual legal consequences of such an act. However, it does not follow that knowledge and intent are not material for the purpose of determining whether or not the doing of the act was voluntary. Greater compulsion is ordinarily required to influence one to perform an act which he knows is wrong or which he knows will result in grave consequences. It will be noted that the Savorgnan case, supra, refers to acts "voluntarily done". If you remove the issue of "voluntary", the mere doing of the act is sufficient to effect expatriation, but in deciding the issue of "voluntary" the trier of fact must consider all evidence relating to the mental condition of the actor to determine whether his act was "unimpelled by another's influence". The record shows that there existed in Japan a veritable wave of pressure aimed at securing a large turnout of voters. The plaintiff was caught up in this wave and carried along by it. He voted because he thought he was re-

quired to vote and *feared* the result if he disregarded the admonition and urging of the occupation authorities. His action was impelled by the influence of those whom he recognized as exercising supreme power and was not voluntary.

The plaintiff is a national of the United States, and judgment to that effect will be entered for the reasons stated in this opinion.

Plaintiff will accordingly prepare findings and a decree and present them to the court for signature.