**TOMASICCHIO v. ACHESON, Secretary of State.**

**Civ. A. No. 2613–49.**

United States District Court
District of Columbia.
June 18, 1951.

Jack Wasserman, of Washington, D. C., for plaintiff.

George Morris Fay, U.S. Atty. and Ross O'Donoghue, Asst. U. S. Atty., both of Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is an action against the Secretary of State to procure a judgment declaring the plaintiff to be a citizen of the United States.[1]

1. The action is brought under 8 U.S.C.A. § 903, the pertinent provisions of which are as follows: "If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in the District Court of the United States for the District of Columbia or in

The principal question involved is as follows. If a person born in the United States of alien parents is taken during his minority to the country of which his parents are nationals and continues to reside there after attaining his majority without exercising an election to retain citizenship of the United States, does he automatically become expatriated within a reasonable time after becoming twenty-one years of age, if the country of his residence claims him as its subject or citizen?

To formulate the same question in a somewhat different form, if a person who is a citizen of the United States by birth in this country, but whose parents are aliens, is taken during his minority to the country to which they owe allegiance and continues to reside there, is he under an obligation to make an affirmative election to retain his American citizenship upon reaching his majority, if he desires to remain a citizen of the United States and if the country in which he resides also claims his allegiance?

█ The salient facts bearing on this question are undisputed. The plaintiff was born in the United States on June 16, 1915. His parents were subjects of Italy. He had dual nationality as he was a national of both the United States and Italy at birth. In August, 1915, he was taken by his parents to Italy and resided there continuously until after the institution of this action in 1949. In 1937 he wrote a letter to the American Consul in Naples requesting information "regarding repatriation". No reply to this communication was forthcoming.[2] The plaintiff testified that he was prevented by poverty from returning to the United States.

The Government claims that in order to retain his citizenship the plaintiff was under an obligation to return to the United States within a reasonable time after attaining his majority, or at least to perform some other affirmative act that would indicate an election to remain a citizen of the United States. The Government further contends that failure so to do operates as an expatriation and deprives the plaintiff of his American nationality.

█ By reason of differences between nationality laws of various countries, there are many persons whose allegiance is claimed by two or more states, or conversely, on whom the benefits of nationality are conferred by two or more countries. These conflicts arise principally by reason of the fact that in some countries nationality is governed by *jus soli,* i. e., it originates by birth within the country; in others, it is based on *jus sanguinis,* i. e., the child inherits the nationality of his parents irrespective of his place of birth; and in still others, like the United States, it may be predicated on either *jus soli* or *jus sanguinis.* Thus, a person born in the United States is a citizen thereof irrespective of the nationality of his parents. Conversely, a person whose parents are citizens of the United States inherits their citizenship irrespective of the place of his birth. By the same token the state to which the parents owe allegiance or the country in which the child was born, may claim him as its own under its laws. A person who is claimed as a subject or citizen by two states is said to possess a dual nationality. Dual nationality is a well recognized concept in international law, because the situation is one that frequently arises. Writers on international law have often observed in a

the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. * * * "

2. A photostatic copy of the letter was produced by Government counsel from the files of the Department of State. Government counsel also stated that no carbon copy of any reply was found in the files. Consequently, the plaintiff's testimony on this point is corroborated

by Government records. While the Government may not be estopped as a matter of law by the negligence of its officers or agents, nevertheless, failure to reply to a letter of such importance created an inequitable situation. It seems unfair to charge a layman with knowledge of intricate rules of law relating to citizenship and nationality, when an inquiry seeking information from the proper official remains unanswered.

general way, at times somewhat loosely, that a person in this position upon reaching his majority has the right to elect which nationality he will retain; that he is under a duty to make the choice; and that if he fails to do so, he becomes permanently subject to the laws of the country in which he then resides, if he is living in one of the states that claim his allegiance.[3]

██ Citizenship depends, however, entirely on municipal law and is not regulated by international law. Acquistion of citizenship of the United States is governed solely by the Constitution and by Acts of Congress. All persons born in the United States and subject to its jurisdiction are citizens of the United States at birth.[4]
Similarly, expatriation or loss of citizenship is regulated solely by Acts of Congress or by treaty.[5] Provisions relating to this subject are found in the Nationality Code of 1940, 8 U.S.C.A. §§ 800–810. It is expressly stated in Section 808 that "The loss of nationality under this chapter shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this chapter". In other words, provisions found in the Nationality Code regarding expatriation are exclusive.

Citizens of the United States who possess dual nationality may be divided into several groups. In the one category are included persons born in the United States of alien parents, but whose allegiance is claimed by the state of the parents' nationality. In a second class are found persons born abroad whose parents are citizens of the United States, but on whom citizenship is also conferred by the land of their birth. A third group comprises persons who become citizens of the United States either by their own or their parents' naturalization, but whose country of origin

does not recognize expatriation. A fourth type of dual citizenship arises in the case of minors who are citizens of the United States, but whose parents become naturalized in a foreign state and who thereby acquire the new nationality of their parents. This enumeration is not to be deemed exclusive, but comprehends the principal situations giving rise to dual nationality. The plaintiff in this action is in the first of these categories, namely, he is a person born in the United States of alien parents and his allegiance is also claimed by the state of the nationality of his parents, i. e., Italy.

██ Whether the doctrine of election is applicable to any of the types of dual nationality must be determined by recourse to the pertinent statutes. Section 801(a) of 8 U.S.C.A. declares that a person who is a national of the United States, either by birth or naturalization, shall lose his nationality by obtaining naturalization in a foreign state either upon his own application or through the naturalization of a parent having legal custody of such person. It is provided, however, that nationality shall not be lost as a result of naturalization of a parent unless and until the child shall have attained the age of twenty-three years without acquiring a permanent residence in the United States.[6] It is further provided that such a person shall be permitted to return to the United States within two years from the effective date of the Act and take up permanent residence therein, and in that event it shall thereafter be deemed that he has elected to be an American citizen.[7] Failure to do so is regarded as a determination on his part to discontinue his status as an American citizen. He is estopped from thereafter claiming American citizenship. In other words, the doctrine of election is ex-

3. 1 Oppenheim, International Law, 5th Ed. Secs. 308–310; 1 Westlake, International Law, pp. 223–232; 2 Hyde, International Law, 2d Ed., pp. 1131–1140; Van Dyne, Citizenship of the United States, 25.
4. Fourteenth Amendment to the Constitution, Section 1; 8 U.S.C.A. § 601(a); United States v. Wong Kim Ark, 169 U.

S. 649, 18 S.Ct. 456, 42 L.Ed. 890; Perkins v. Elg, 307 U.S. 325, 329, 59 S. Ct. 884, 83 L.Ed. 1320.
5. Perkins v. Elg, 307 U.S. 325, 329, 59 S.Ct. 884, 83 L.Ed. 1320.
6. A similar provision is contained in Sec. 807.
7. This two-year period was extended from time to time.

pressly made applicable to persons who acquire dual citizenship by the naturalization of their parents in a foreign country.

Prior to the enactment of the Nationality Code of 1940, provisions in respect to expatriation were found in the Act of March 2, 1907.[8] There has been no statutory provision, and there is none now, requiring election in any form on the part of a person who has dual nationality, or providing for expatriation because of failure to elect citizenship of the United States in respect to any dual national, except of the type heretofore mentioned, namely, a person who acquires the second nationality by his parents' naturalization in a foreign state.

Richard W. Flournoy, a leading authority on the law of citizenship, recognizes that the Nationality Code does not require election under the conditions involved in this case. He says:[9] "It seems unfortunate that the Code contains no provision for automatic termination of American nationality in cases of persons having also the nationality of foreign states and residing for protracted periods, after attainment of majority, in the territories of such states."

The Government relies on Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed 1320, in support of its contention that the plaintiff became expatriated because of his failure to elect citizenship of the United States within a reasonable time after attaining his majority. That case, however, presented a different problem and is distinguishable on principle. It involved a woman born in this country of Swedish parents, who were naturalized citizens of the United States. During her minority she was removed by her parents to Sweden who resumed their citizenship in that country and renounced American citizenship, thereby according Swedish nationality to her. She returned to the United States shortly after reaching her majority. Several years later she was notified by the Immigration and Naturalization Service that she was an alien illegally in the United States and was threatened with deportation. The Supreme Court held that the naturalization of her parents in Sweden during her minority did not operate as a termination of her American citizenship, on the theory that a person cannot lose his citizenship except by an act of his own performed after reaching his majority, and may not be deprived of his birthright by any action of his parents. All that this case holds, therefore, is that the naturalization of a citizen's parents in a foreign country during the citizen's minority does not divest the latter of his nationality by operation of law. It is also true that the Supreme Court refers to the fact that in that case the citizen made an affirmative election to retain American citizenship by returning to this country shortly after attaining majority. These statements may be regarded as obiter, since the opinion does not indicate what would have happened had the election not taken place. Even if, however, this decision should be construed as a ruling that election to retain American citizenship was required in respect to the plaintiff in that case, it would not sustain the position of the Government in the present instance. The plaintiff in Perkins v. Elg belonged in the fourth group of dual citizens described above, namely, she was a minor who was a citizen of the United States, but whose parents became repatriated in a foreign state, and who thereby acquired the new nationality of her parents. As shown above, the Nationality statutes expressly apply the doctrine of election to a person in that situation. They do not extend that doctrine to any of the other types of dual citizenship, such as that of persons born in the United States of alien parents, but whose allegiance is claimed by the state of their parents' nationality. There is nothing in Perkins v. Elg, therefore, that detracts from the conclusion reached above or that sustains the contentions of the Government.

It may be illuminating to consider the administrative practice in respect to this

8. 34 Stat. 1228.
9. R. W. Flournoy, "The Nationality Act of 1940", Contemporary Law Pamphlets, 1941, New York University School of Law, International Law Series, p. 10.

subject. The two agencies of the Executive branch of the Government that administer various aspects of the laws relating to citizenship are the Department of State and the Immigration and Naturalization Service, which was formerly a part of the Department of Labor, but is now a division of the Department of Justice. We shall consider the practice of each of these agencies separately.

While the policy of the Department of State in connection with issuing passports and extending diplomatic protection to persons possessing dual nationality and residing abroad, has been clear and consistent, its expressions have been at times lacking in precision. As a result some of its statements have been cited as supporting the doctrine of election even in respect to persons in the situation of the present plaintiff.. It seems helpful to examine a few administrative rulings of the Department of State and its typical pronouncements in chronological order.

On February 15, 1888, Secretary of State Bayard wrote to Mr. McLane, Minister to France, as follows:[10] "It has further been repeatedly held by us, as you are aware, that when a person thus born in the United States arrives at twenty-one in a foreign country, the mode of expressing his election to be a citizen of the United States is by promptly returning to the United States. The same distinction is applied to children born abroad to citizens of the United States. There is, in both these cases, what is called double allegiance; and by the law of nations the nationality of such persons is to be determined by their own election of nationality at their majority, which election is evidenced by placing themselves in the country they elect. Should such persons after electing the United States, and here taking up their domicil, go to France for a transient visit, it will be your duty to protect them as citizens of the United States."

On July 18, 1921, the Director of the Consular Service wrote as follows to the Consul at Helsingfors:[11] "The Department has in numbers of instances in the past recognized the principle of election in cases of dual nationality, that is, in cases of persons born in the United States of alien parents or of persons born abroad of American parents. Such decisions have related to the right to protection, rather than to the strictly legal title to citizenship, since there is no statute of the United States providing that a person of the class mentioned loses his American citizenship by electing the nationality of the other country concerned."

On November 24, 1923, the Department of State issued a series of instructions to American diplomatic and consular officers. These instructions contained the following statements:[12]

"The department must, therefore, be reluctant to declare that particular conduct on the part of a person after reaching adult years in foreign territory produces a forfeiture or something equivalent to expatriation.

"The statute does, however, make a distinction between the burden imposed upon the person born in the United States of foreign parents and the person born abroad of American parents. With respect to the latter, section 6 of the Act of March 2, 1907, lays down the requirement that, as a condition to the protection of the United States, the individual must, upon reaching the age of 18, record at an American consulate an intention to remain a citizen of the United States, and must also take an oath of allegiance to the United States upon attaining his majority.

"The child born of foreign parents in the United States who spends his minority in the foreign country of his parents' nationality is not expressly required by any statute of the United States to make the same election as he approaches or attains his majority. It is, nevertheless, believed that his retention of a right to demand the protection of the United States should, despite the absence of statute, be dependent

10. 3 Moore, Digest of International Law, p. 548.

11. Hackworth, Digest of International Law, Vol. III, p. 370.

12. Quoted in Perkins v. Elg, 307 U.S. 325, 345–346, 59 S.Ct. 884, 894, 83 L. Ed. 1320.

upon his convincing the department within a reasonable period after the attaining of his majority of an election to return to the United States, there to assume the duties of citizenship. * * * On the other hand, it may be asserted negatively, that one who has long manifested no indication of a will to make such an election should not receive the protection of the United States save under the express approval of the department".

On November 30, 1936, the Department of State made the following pronouncement in a communication to the Consul General in London:[13] "The Department over a number of years held in cases of persons who were born in the United States of alien parents and thus acquired American citizenship under Article XIV of the Amendments to the Constitution of the United States and likewise acquired the nationality of the state of which their parents were citizens or subjects under its laws that, if such persons were taken abroad during their minority and resided in the country of which their parents were nationals, they were required to demonstrate their election of the nationality of the United States after attaining majority or otherwise were not held to be entitled to recognition as citizens of the United States. However, in 1926, the Department reconsidered the whole subject of election of nationality by persons having a dual nationality status and concluded that in the absence of legislative authority it was not warranted in declining to accord recognition as citizens of the United States to persons who were born in the United States of alien parents merely because they have resided abroad for protracted periods before and after attaining majority. Nevertheless, with respect to the matter of protection the Department considers the period of residence abroad of a person having dual nationality before and after attaining majority. If the period of foreign residence in the country of which he is also a national has been of long duration, it has been its practice to decline

to issue passports save under exceptional circumstances."

Thus, it is the established policy of the Department of State to consider the question of election in connection with a dual national only in determining whether to extend protection to such a citizen of the United States who is permanently residing abroad. The Department has recognized that such a person does not lose his citizenship except under the circumstances and in the instances expressly prescribed by statutory law of the United States. It has been the traditional course, however, not to extend diplomatic protection to a citizen of the United States who possesses dual citizenship and who after reaching his majority is permanently residing in the other country that claims his allegiance. On the other hand, it has not been the view of the Department that such a person automatically becomes expatriated and loses his status as a citizen of the United States. There is a vast distinction in principle between loss of citizenship and deprivation of the privilege of protection at the hands of the American Government.

This distinction is recognized by Flournoy, who makes the following comments in respect to this point:[14]

"As to the effect of election, it is important to consider whether an election once made is final, that is, in particular, whether an actual or presumptive election of foreign nationality results in a loss of American citizenship, or whether it results merely in a temporary loss of the right to the protection of this government. There are a number of pronouncements of Secretaries of State to the effect that such an election actually results in a loss of American citizenship. * * *

"However, the decisions of the Department of State in cases involving election seem to relate generally to the right to protection rather than to nationality as a matter of strict law, for, as the Department has repeatedly stated, the technical legal status of citizenship does not nec-

---

13. Hackworth, Digest of International Law, Vol. III, p. 371.

14. Flournoy, Dual Nationality and Election, 30 Yale Law Journal, pp. 545, 562–563.

essarily carry with it the right to protection. * * * In these cases the Department of State, as a rule, did not decide that the legal status of American citizenship was lost by an express or inferential election of the foreign nationality. * * * Whether or not the persons concerned had lost their legal title to American citizenship, the Department held that they had placed themselves in a position where they were not equitably entitled to the protection of this Government."

The second governmental agency that administers certain phases of the laws of citizenship is the Immigration and Naturalization Service of the Department of Justice. A ruling on this point was made by the Board of Immigration Appeals, In the matter of R——.[15] This case involved a person born in the United States in 1873 of German parents, who was taken by her parents to Germany three years later and never returned to this country. The Board overruled the contention that as a dual citizen of the United States and Germany she became expatriated by failing to make an election after attaining her majority. The Board stated its conclusions as follows: "It has not been recognized by the Immigration and Naturalization Service or by the Board that a native-born child having dual citizenship must elect between two citizenships upon attaining his majority; it has not been recognized by the courts; and the statements of authorities to this effect are subject to question insofar as they are based upon State Department rulings, which are determinative of the right of protection and not of citizenship, as such."

The Immigration and Naturalization Service is an agency of the Department of Justice. It may perhaps seem somewhat inconsistent for representatives of that Department in this case to take a position contrary to that of another branch of the same Department. Perhaps they should not be reproached for this attitude, for it has been said by a great American philosopher that "a foolish consistency is the hobgoblin of little minds."

■ In the light of the foregoing discussion, this Court reaches the conclusion that a person born in the United States of alien parents, who possesses dual nationality and who permanently resides during his minority in the other country that claims his allegiance, need not make any election to retain his American citizenship on reaching his majority and does not become expatriated by failure to do so.

Two other contentions are advanced by the Government in support of a conclusion that the plaintiff has become expatriated.

■ The plaintiff served in the Italian Army from April 1936 to August 1936, and again from November 25, 1940 to September 12, 1943. The Government claims that in connection with his military service the plaintiff took an oath of allegiance to Italy. The Government urges that on the basis of these facts, the plaintiff became expatriated under the provisions of 8 U.S.C.A. §§ 801, 801(b) and 801(c):

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\* \* \* \* \* \*

"(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; * * *."

■ It was conceded that Italy had a system of conscription and that the plaintiff did not enlist or take the oath voluntarily, but did so as a result of compulsion by Italian law. Expatriation under the foregoing provisions of law takes place only if service in the foreign army is voluntary, Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860, 863. That case contains the following illuminating observations on this point: "It is to be noted that subsection (c) of the draft code was not limited to cases of dual nationality; and unless the words 'entering, or serving in, the armed forces of a foreign state'

15. 1 Dec. Imm. and Nat. Laws, 389, 392.

implied that the induction must be voluntary, then any American citizen who, during a visit abroad, might be grabbed and put in the army of the foreign state would automatically lose his American citizenship."

The Government argues that the plaintiff was under a duty to protest against being drafted into the Italian army and not to submit without a contest. No doubt, however, a protest would have been futile and a refusal to take the oath would have been equally ineffective. The plaintiff might well have feared severe reprisals if he either protested or contested the order to respond to the draft. During the Fascist regime in Italy it would have been realistic to fear such an eventuality. The Government does not restrict its solicitude to stout-hearted men. The timid, the weak, and the ignorant are equally entitled to its protection. The law does not exact a crown of martyrdom as a condition of retaining citizenship.

▉ Moreover, if the plaintiff took an oath of allegiance upon being drafted into the Italian Army, he was then a minor and, consequently, the taking of the oath did not operate as an expatriation, United States ex rel. Baglivo v. Day, D.C., 28 F.2d 44.

▉ The final contention made by the Government is that the plaintiff became expatriated by "Voting in a political election in a foreign state", 8 U.S.C.A. § 801(e). The plaintiff admits that he voted in Italy at an election for mayor in March 1946, although he claims to have cast a blank ballot. He also admits that he voted in Italy in an election in 1948. He claims that he voted as a result of duress, exercised by means of posters threatening with penalties anyone failing to vote. He also claims that he was informed that anyone who did not vote would be unable to get food because he would receive no ration coupons. Common knowledge of conditions prevailing in some European countries lends credence to the plaintiff's contentions.

The Court finds that the voting was under duress and that, therefore, it did not operate as an expatriation. Etsuko Arikawa v. Acheson, D.C., 83 F.Supp. 473, 476; Mitsue Masuko Kai v. Acheson, D.C., 94 F.Supp. 383, 384; Hichino Uyeno v. Acheson, D.C., 96 F.Supp. 510.

The Court concludes that the plaintiff has remained and is now a citizen of the United States.

Counsel will submit proposed findings of fact, conclusions of law and judgment in accordance with the foregoing discussion.