**GUALCO et al. v. ACHESON, Secretary of State.**

**No. 30237.**

United States District Court
N. D. California, S. D.

July 29, 1952.

---

Earl C. Berger, San Francisco, Cal., for plaintiffs and petitioners.

Chauncey Tramutolo, U. S. Atty., Edgar R. Bonsall, Asst. U. S. Atty., San Francisco, Cal., for defendant and respondent.

GOODMAN, District Judge.

Petitioners, a brother and sister who have resided in Italy since early childhood, seek, pursuant to Section 503 of the Nationality Act of 1940, 54 Stats. 1171, 8 U.S.C.A. § 903, a judgment declaring them to be United States citizens. Their petition is prompted by the refusal of the Department of State to issue them passports for their return to the United States upon the ground that they have forfeited the United States citizenship acquired by birth in this country.

The difficult questions presented by this petition result from the somewhat halting efforts of the Congress to cope with the vexatious problems of dual nationality. Many persons possess so-called dual nationality; that is, they are simultaneously claimed as citizens by two nations. This status most frequently occurs because most countries bestow citizenship both upon persons born within their boundaries and upon persons born to their citizens abroad. Dual nationality also occurs because some nations do not consider their citizens expatriated by naturalization in another country.

This so-called dual nationality is a cause of international difficulty and dispute. One of the principal areas of friction exists because many immigrants to the United States, after a few years here, return to their native land taking with them chlidren born here. Even if the parents are naturalized in this country, they usually reacquire the nationality of their native land by operation of law within a few years after resuming residence there. At the same time any children who may have been born in this country after the parents' naturalization acquire the nationality of the parents' native land. Any children born in this country prior to the parents' naturalization will

ordinarily acquire, at birth, the nationality of their parents as well as United States citizenship. Such children ordinarily retain this foreign nationality even after the parents' naturalization. If the parents are never naturalized in this country, all of the children born here will almost always possess the citizenship of the parents as well as United States citizenship.

As these children with dual nationality reach adulthood in the native land of their parents, active duties of citizenship, such as military service, are there imposed upon them. Many of them then attempt to use their United States citizenship as a shield against these burdens. As a result, the United States is drawn into international controversies. Despite the serious nature of this problem the Congress has been slow to deal with it. The law has developed via administrative and judicial rulings in particular cases, with consequent uncertainties and inconsistencies which have contributed to the difficulty facing the petitioners today.

To avoid controversies with other nations, the Department of State, since at least as early as 1867, has refused to accord protection to United States nationals who reside during minority in a foreign state of which they are also nationals, unless, upon majority, or within a reasonable time thereafter, they elect to return to the United States and assume the duties of United States citizenship. The courts, through the years, have also alluded to the right of children possessing dual nationality to elect, upon reaching majority, the allegiance they wish to follow. But neither the courts nor the Department of State has ever determined that a United States national, who resides during minority in a foreign state of which he is also a national, should forfeit his United States citizenship upon majority, unless he manifests an election to retain such citizenship in some manner such as returning to this country. See Flourney, Dual Nationality and Election, 30 Yale Law Review 545 (1921); Orfield, Expatriation of American Minors, 38 Michigan Law Review 585 (1940); Nielsen, Some Vexatious Questions Relating to Nationality, 20 Columbia Law Review 840, (1920).

On June 16, 1932, the Attorney General made a ruling in the case of Ingrid Theresa Tobiassen, 36 Op.Atty.Gen. 535, which greatly restricted the right of American citizens, who resided during minority in another country, whose nationality they also acquired, to elect United States citizenship upon majority. The Attorney General ruled that a child born to naturalized citizens in this country, who is taken during minority to the native land of his parents, and who acquires the nationality of that country upon the resumption by his parents of their former allegiance, thereupon loses United States citizenship. This decision was based upon a new interpretation of Section 2 of the Expatriation Act of 1907, 34 Stats. 1228. That section provided that: "any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state." The opinion of the Attorney General was that a child, who derived the nationality of a foreign state upon his parents naturalization there, was "naturalized in a foreign state" within the meaning of Section 2.

The Department of State thereafter followed the Tobiassen ruling. It no longer recognized the right of children in the Tobiassen category to elect to retain United States citizenship upon attaining their majority. The Department continued to accord the right of election to children who were citizens of both the United States and the country of their parents' origin from birth, since these children did not acquire their foreign citizenship through derivative naturalization and could not be within the terms of Section 2 of the Expatriation Act.

On May 29, 1939, in Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320, the Supreme Court disapproved the decision of the Attorney General in the Tobiassen case. The Court stated in 307 U.S. at page 329, 59 S.Ct. at page 887, that "It has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose

his citizenship in the United States provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties." The Court held that the Congress had not intended, by the Expatriation Act of 1907 to deprive such children of the right to elect United States citizenship upon majority. The Court further noted that it would not be a "sensible distinction" to accord the right of election to children, who from birth, possessed both the nationality of the United States and the nationality of a foreign state, where they resided during minority, and to deny the right of election to children who did not acquire the foreign nationality until their parents resumed their former residence and allegiance. Thus, in the Elg case, the Supreme Court upheld the right of election. It did not, however, determine whether the right was also a duty in the sense that, if these children continued to reside in the foreign state after majority, they would forfeit their United States citizenship unless they manifested an election to retain it.

Through the years prior to Elg, there had been a growing recognition by interested persons and agencies of government that comprehensive legislation was the only solution for the complex nationality problems of the United States. By executive order on April 25, 1933, the President designated the Attorney General and the Secretaries of State and Labor as a committee to review the nationality laws of the United States, to recommend revisions, and to codify the laws into one comprehensive nationality law for submission to Congress. Because of the complexity and importance of the problems involved, the committee did not complete its work for several years. On June 13, 1938, the President transmitted the report of the Committee to the Congress, accompanied by the draft code and explanatory comments.

The draft code contained the following two sets of provisions providing for the expatriation of United States nationals, who were taken during minority to the country of their parents' origin, where the parents resumed their former allegiance:

(1) "Sec. 401. A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person;

(2) "Sec. 405. A person having American nationality, who is a minor and is residing in a foreign state with or under the legal custody of a parent who loses American nationality under section 402 of this chapter, shall at the time lose his American nationality if such minor has or acquires the nationality of such foreign state.

"Sec. 402. A person who has become a national by naturalization shall lose his nationality by:

(a) Residing for at least two years in the territory of a foreign state of which he was formerly a national or in which the place of his birth is situated, if he acquires through such residence the nationality of such foreign state by operation of the law thereof; or

(b) Residing continuously for three years in the territory of a foreign state of which he was formerly a national or in which the place of his birth is situated, except as provided in section 404 hereof.

"Sec. 407. Nationality shall not be lost under the provisions of section 402 or 405 of this chapter until the expiration of one year following the date of the approval of this Act:  *  *  * ."

These provisions were merely statutory restatements of the ruling of the Attorney General in the Tobiassen case, Elg not yet having been decided.

The draft code was considered by the Congress during its sessions of 1939 and 1940. During the course of this deliberation, Elg was decided. Consequently, the Congress amended Sections 401(a) and 405 of the draft code to conform with the Supreme Court's ruling. To each section the Congress added the proviso that a minor

child residing abroad with his parents should not lose American nationality as the result of the loss of such nationality by the parents unless and until the child attained the age of twenty-three without acquiring permanent residence in the United States. The Congress recognized that some opportunity should be afforded those persons who have attained the age of twenty-three prior to the passage of the new code, to preserve their United States citizenship. Section 407 of the draft code, set forth above, already provided that nationality should not be lost under section 405 until the expiration of *one year following the date of the approval of the statute.* The Congress, therefore, added a further proviso to Section 401(a) as follows:

> "Provided further, that a person who has acquired foreign nationality through the naturalization of his parent or parents, and who at the same time is a citizen of the United States, shall, if abroad and he has not heretofore expatriated himself as an American citizen by his own voluntary act, be permitted within *two years from the effective date of this Act* to return to the United States and take up permanent residence therein, and it shall be thereafter deemed that he has elected to be an American citizen. Failure on the part of such person to so return and take up permanent residence in the United States during such period shall be deemed to be a determination on the part of such person to discontinue his status as an American citizen, and such person shall be forever estopped by such failure from thereafter claiming such American citizenship;"

No reason can be deduced why the Congress originally accorded a longer period of time in which to return to the United States without loss of citizenship under section 401(a) than the time permitted under section 405. Particularly since both sections, in the main, apply to the same class of persons.

As thus amended, the provisions discussed above became part of the Nationality Act of October 14, 1940, the effective date of which was January 13, 1941. Section 401(a) remained section 401(a) in the Nationality Act, 8 U.S.C.A. § 801(a); sections 402, 405 and 407 of the draft code became respectively sections 404, 407, and 409 of the Nationality Act, 8 U.S.C.A. §§ 804, 807, 809. Subsequently on four different occasions the Congress amended section 409 of the Act (407 of the draft code) extending the time in which to return to the United States without loss of citizenship under section 407 of the Act (405 of the draft code.)[1] The last extension permitted return to the United States up to October 14, 1946. The time permitted for return before loss of citizenship under Section 401(a), was, up to January 13, 1943, two years from the effective date of the Act. This time has never been extended. Hence the discrepancy between the two periods became very great. The reason given for the extension of time to return under section 407 of the Act was that inadequate transportation facilities made an earlier return impossible for many persons. See House Report 1170, Senate Report 705, 77th Congress, 1st Session; House Report 2225, Senate Report 1616, 77th Congress, 2d Session; House Report 1230, Senate Report 1077, 78th Congress, 2d Session; House Report 780, Senate Report 615, 79th Congress, 1st Session.

This then is the legal background bearing upon the present citizenship status of the petitioners. The facts relevant to their status are comparatively simple.

■ Petitioners' father, an Italian by birth, immigrated to the United States in 1905. Their mother, also an Italian by birth, came to this country about 1910. A son, Andrew, the brother of the petitioners, was born in 1912. Andrew possessed dual nationality at birth. He acquired United States citizenship by birth in this country; under Italian law, he derived citizenship from his parents who were then Italian nationals.

1. 55 Stat. 743 (Oct. 16, 1941); 56 Stat. 779 (Oct. 9, 1942); 58 Stat. 747 (Sept. 27, 1944); 59 Stat. 544 (Oct. 11, 1945.)

On September 1, 1914, petitioners' parents became citizens of the United States by naturalization. Thereby, under Italian law, they forfeited their Italian citizenship. The petitioner, Elsi, was born in San Francisco on May 31, 1916. Her brother, Giovanni, the other petitioner, was born in San Francisco March 25, 1919. Both Elsi and Giovanni acquired only United States citizenship at birth inasmuch as their parents were then no longer Italian citizens.

In November of 1924, when Elsi was 8 and Giovanni 5, the Gualco family went to Italy. In 1930, when Andrew was 18, he returned to the United States on an American passport, and has since remained here. The rest of the family continued to reside in Italy.

On September 21, 1935, Giovanni, then 16, accompanied by his father, applied at the United States consulate at Genoa for a United States passport to enable him to return to this country. In accordance with the Tobiassen ruling then being followed, the consul determined that Giovanni had lost his United States citizenship on November 12, 1926, when he acquired Italian nationality by operation of law upon the resumption by his parents of their former allegiance. Giovanni was therefore denied a passport.

A year later on September 29, 1936, Giovanni again applied for a United States passport, this time to the United States Consul at Turin. Again his application was denied in accordance with the Tobiassen ruling.

When Giovanni was 20, in March of 1939, he was drafted into the Italian army. On September 8, 1943, upon the surrender of Italy to the Allied powers, Giovanni was taken as a prisoner of war by German forces and imprisoned in Germany. Ill treatment there seriously impaired his health. Following his release and discharge from the Italian army on January 29, 1946, he recuperated at his parents' ranch. On August 27, 1948, he applied to the United States consul at Genoa for a United States passport. The consul denied his application and issued a certificate of his loss of United States nationality claiming to act under the provisions of the Nationality Act of 1940.

In the meantime, Elsi, on November 10, 1945, had married an Italian citizen, Felice Bernasconi. She voted in the Italian election of June 2, 1946, allegedly casting a blank ballot. On August 28, 1946 she obtained an Italian identity card. In September 1946 she gave birth to a child. On May 5, 1948, she applied to the United States consul at Turin for a United States passport. The consul denied the application on May 11, and issued a certificate of her loss of United States nationality under the provisions of the Expatriation Act of 1907. On November 30, 1949, Elsi applied for a United States passport at the United States consulate at Genoa. This application was also denied.

Petitioners, on December 12, 1950, filed this action for a judgment declaring them to be United States citizens. Certificates of identity were issued to them to permit them to return to the United States to testify. Hearings were held in this court on November 13 and 19, and December 10, 1951.

It is the contention of the government that Giovanni lost his United States citizenship under Section 401(a) of the Nationality Act of 1940 in that he acquired Italian nationality through the naturalization of his parents while in their custody and failed to return to the United States by his twenty-third birthday or by January 13, 1943.

But, it must be noted at the outset that these same circumstances would produce loss of nationality under Section 407 of the Nationality Act of 1940. Section 407 provides:

"A person having American nationality, who is a minor and is residing in a foreign state with or under the legal custody of a parent who loses American nationality under section 404 of this chapter, shall at the same time lose his American nationality if such minor has or acquires the nationality of such foreign state: Provided, That, in such case, American nationality shall not be lost as the result of loss of

American nationality by the parent unless and until the child attains the age of twenty-three years without having acquired permanent residence in the United States."

As previously noted, Section 409 of the Nationality Act, as amended, provides that nationality shall not be lost under Section 407 unless the person claiming citizenship has not returned to the United States by October 14, 1946. It would appear that if the same circumstances bring a person within the provisions of both Section 401 (a) and 407, he would be entitled to the longer period in which to return accorded by Section 407. Of course, Giovanni did not return to the United States even by October 14, 1946. But his failure to return by that date is relevant to a determination of the effect of Section 407 on his citizenship.

The petitioner, Giovanni, urges that continued residence abroad beyond his twenty-third birthday or beyond January 13, 1943 does not work an expatriation under Section 401(a) unless such continued residence was voluntary. He notes that the courts have held that the other acts of expatriation set forth in Section 401, such as taking an oath of allegiance to a foreign state, serving in the armed forces of a foreign state, voting in a political election in a foreign state, and renouncing United States citizenship, do not result in expatriation unless such acts are voluntary.[2]

The purpose of the Congress in providing a period after majority in which a person can return to the United States was to conform with the Elg ruling that minors must be given a reasonable opportunity after attaining majority to elect whether to retain United States citizenship. This purpose would be thwarted if the individual is held to the specified period despite the fact that during that period he has no free choice and cannot return to the United States. In my opinion Section 401(a) should be interpreted to mean *voluntary* residence abroad beyond the specified date.

From before the passage of the Nationality Act of 1940 until long after January 13, 1943, Giovanni was serving in the armed forces of a nation at war. That he could not have returned to the United States during this period is manifest. The Government concedes that this military service was not voluntary else that in itself would have expatriated him. In my opinion, Giovanni was not expatriated by his failure to return to the United States by January 13, 1943.

Although the Government does not rely on Section 407 of the Nationality Act to establish Giovanni's expatriation, it is well to note that that Section is equally susceptible of the interpretation that only a *voluntary* residence abroad beyond the date specified works an expatriation. October 14, 1942 was the date originally specified by which residence in the United States should be resumed to forestall expatriation under Section 407. But, as previously pointed out, the lack of adequate transportation facilities prompted Congress to ex-

2. Podea v. Acheson, 2 Cir., 1950, 179 F.2d 306 (oath of allegiance); Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 1947, 161 F.2d 860; In re Gogal, D.C.W.D.Pa. 1947, 75 F.Supp. 268; Ishikawa v. Acheson, D.C.Hawaii1949, 85 F.Supp. 1; Shibata v. Acheson, D.C.S.D.Cal.1949, 86 F.Supp. 1; Podea v. Anderson, 2 Cir., 1950, 179 F.2d 306; Kanno v. Acheson, D.C.S.D.Cal.1950, 92 F.Supp. 183; Kato v. Acheson, D.C.S.D.Cal.1950, 94 F.Supp. 415; Ozasa v. Acheson, D.C.S.D.Cal. 1950, 94 F.Supp. 436; Tomasicchio v. Acheson, D.C.1951, 98 F.Supp. 166; Morizumi v. Acheson, D.C.N.D.Cal.1951, 101 F.Supp. 976 (military service); Arikawa v. Acheson, D.C.S.D.Cal.1949, 83 F.Supp. 473; Ouye v. Acheson, D.C. Hawaii 1950, 91 F.Supp. 129; Yamamoto v. Acheson, D.C.Ariz.1950, 93 F.Supp. 346; Furuno v. Acheson, D.C.S.D.Cal. 1950, 94 F.Supp. 381; Masuko Kai v. Acheson, D.C.S.D.Cal.1950, 94 F.Supp. 383; Seki v. Acheson, D.C.S.D.Cal.1950, 94 F.Supp. 438; Rokui v. Acheson, D. C.S.D.Cal.1950, 94 F.Supp. 439; Kuwahara v. Acheson, D.C.S.D.Cal.1951, 96 F.Supp. 38; Uyeno v. Acheson, D.C.W. D.Wash.1951, 96 F.Supp. 510; Nakashima v. Acheson, D.C.S.D.Cal.1951, 98 F.Supp. 11 (voting in elections); Acheson v. Murakami, 9 Cir., 1949, 176 F.2d 953; Tadayasu Abo. v. Clark, D.C.N.D. Cal.1948, 77 F.Supp. 806 (renunciation of citizenship.)

tend this date to October 14, 1946. Had Giovanni taken steps to return to the United States immediately upon his discharge from the Italian army at the end of January 1946, he might possibly have been able to reach this country by October 14, 1946. But, for sometime after his discharge he was recuperating from the ill-treatment received in Germany. The evidence is not conclusive as to the seriousness of his illness. But, it can fairly be assumed that his health was sufficiently impaired to preclude immediate plans for returning to the United States. This being so, the few months, which the final extension of time made available to Giovanni in which he might possibly have returned to the United States after his discharge, cannot be said to have made his continued residence in Italy during those months voluntary so as to work an expatriation under Section 407. Particularly is this so in view of the fact that the Congress fixed the 1946 date solely on the basis of the availability of transportation facilities without consideration of other factors which might prevent a return to the United States.

■ If the failure to return by the dates statutorily specified is excused because the failure was *involuntary,* must the individual return after he is again free to do so in order to preserve his citizenship? The purpose of the Congress in Section 401(a) as well as Section 407 was to make it clear that a minor must elect to return to the United States within a reasonable time after majority. It would seem logical, therefore, that if the election cannot be made within the time specified, it must be made within a reasonable time after the individual is free to make it. The Government contends that such reasonable time cannot exceed two years, after the disability to return is at end, since this was the period originally fixed by Section 401(a) in which a return might be made after majority. The two year period may be an appropriate yard stick. Yet it should not be absolute, as in statutes of outlawry. The test of reasonableness should justly depend upon the relevant circumstances.

Giovanni was discharged from the Italian army on January 29, 1946. He applied for a passport on August 27, 1948. This was *two years and seven months* after his discharge from the Italian army. Considering his ill-health, which necessitated a period of recuperation after his discharge, this does not appear to be an unreasonably long delay.

It must be remembered that in the past decade the problems of expatriation have necessarily been appraised against a background of a world at war. Lack of actual freedom of action in such a setting prompted the doctrine that, to be effective, an act of expatriation must be "voluntary." See Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 1947, 161 F.2d 860. The same philosophy, if we are to be just, should condition our interpretation of Section 401(a). Interpreting Section 401(a), as we do in Giovanni's case, we find comfort in the advice of the Supreme Court that "Rights of citizenship are not to be destroyed by an ambiguity." Perkins v. Elg, supra, 307 U.S. at page 337, 59 S.Ct. at page 891.

■ It is my conclusion that Giovanni's application for a passport on August 27, 1948 was, under all the circumstances, made within a reasonable time after the termination of the events which disabled him from returning to the United States. Hence, for the reasons stated, he is entitled to a declaration establishing his citizenship.

Giovanni also urges that Section 401(a) is not applicable to him at all because he had manifested an election to return to the United States before the enactment of the Nationality Act of 1940. For he had unsuccessfully applied for a United States passport in 1935 and again in 1936. He contends that the Congress did not intend Section 401(a) to apply to those who had previously made an election, under the then existing law, to retain United States citizenship, even though thereafter continuing to remain abroad.[3] This contention does accord with administrative rulings of the United States Board of Immigration Appeals.[4] But there is substantial doubt as

---

3. The same argument would equally apply to Section 407.

4. In the Matter of F, In the Matter of G, and In the Matter of S, Vol. I Admin-

to the validity of this view. Consequently, we prefer to rest decision as to Giovanni upon the grounds heretofore stated.

It is also contended by Giovanni, as well as by his sister, Elsi, that Section 401(a) of the Act of 1940 is constitutionally infirm in that it arbitrarily discriminates between American citizens of the same class. This results, it is claimed, in a denial of due process of law in violation of the Fifth Amendment to the Constitution.

The discriminatory operation of Section 401(a) must be appraised in the light of the effect of Section 407, which, to some extent, complements Section 401(a). The discrimination resulting from the joint operation of Sections 401(a) and 407 is well illustrated within the Gualco family itself. The petitioners, Giovanni and Elsi, were born in the United States after their Italian parents had been naturalized in the United States. After the parents returned to Italy, their naturalization as Italian citizens, by operation of Italian law upon the completion of two years residence there, resulted in the minor petitioners becoming Italian citizens under Italian law. Having acquired Italian citizenship through the naturalization of their parents in Italy, the petitioners became obligated, under Section 401(a), to return to the United States within two years after attaining majority, or within a specified period after the effective date of the Nationality Act of 1940, in order to preserve their American citizenship. Their brother, Andrew, was born in the United States of the same parents but before the parents became naturalized American citizens. He, like petitioners, was a dual national. But, he acquired his Italian, as well as American citizenship at birth. Since he was already an Italian citizen at the time his parents resumed their Italian citizenship, he did not derive Italian citizenship through his parents' naturalization in Italy, and hence is free from the obligation to return to the United States, imposed by Section 401(a).

But a similar obligation to return to the United States is imposed by Section 407. Section 407 has wider scope than Section 401(a) and encompasses both persons in the category of petitioners and those in the category of Andrew. The obligation to return to the United States within two years after attaining majority in order to preserve American citizenship, is imposed by Section 407 upon American-born children in the custody of naturalized American parents who resume their native citizenship, if the children at that time possess the native citizenship of the parents, or thereby acquire such citizenship. Thus Andrew, who possessed Italian citizenship at the time his parents resumed that allegiance, as well as petitioners, who then acquired Italian citizenship, would be subject to the requirements of Section 407. Section 407 reduces the discriminatory effect of Section 401(a) by imposing the same obligation to return to the United States upon persons in the category of Andrew as Section 401(a) places upon persons in the category of petitioners.

But, neither Section 401(a), nor Section 407, nor any other provision of the Act of 1940, places a similar obligation upon a large group of American citizens having the same status as dual nationals as petitioners and Andrew. To illustrate, if Mr. and Mrs. Gualco had not been naturalized in the United States, and had remained Italian nationals during their stay in this country, none of the three Gualco children would be under any statutory obligation to return to the United States in order to preserve their American citizenship. All three Gualco children would then have acquired Italian, as well as American, citizenship at birth. And, since if the parents had always retained their Italian citizenship, they could not thereafter have acquired Italian citizenship by naturalization, the three children would not have been within the scope of either Section 401(a) or 407. Yet the three children would still have been dual nationals residing abroad during minority in the custody of alien parents.

In other words, Sections 401(a) and 407 condition the retention of American citizenship upon a return to the United States within two years after majority in the case of American-born citizens who also possess the citizenship of their parents' native land

and reside there during minority, if the parents at one time were naturalized in the United States and later resumed their native citizenship. But, Sections 401(a) and 407 impose no conditions for the retention of American citizenship upon American-born citizens who also possess the citizenship of their parents' native land and reside there during minority, if the parents were never naturalized in the United States and always retained their native citizenship. This, the Supreme Court said, obiter dicta, in Perkins v. Elg, supra, 307 U.S. at page 347, 59 S.Ct. at page 895, in referring to the Expatriation Act of March 2, 1907, "would not seem to be a sensible distinction." If it was not a sensible distinction as to the Act of 1907, it is difficult to perceive how it could acquire sense in the Act of 1940. The Congressional purpose to eliminate the problems flowing from dual nationality is in no way furthered by the statutory distinction.

This discrimination inherent in the Nationality Act of 1940 is arbitrary.[5] Not in the sense that the Congress clearly intended such discrimination, but in the sense that there does not appear to be any reasonable explanation of any kind for the distinction made. We do not mean to imply that the distinction was deliberate on the part of the Congress. More likely it was in the nature of an oversight. But that in no way lessens the discrimination. Statutes that arbitrarily discriminate are dangerous and unfair. Particularly is this so when so valuable and important right as that of American citizenship is at stake.

What has been said points up that the court might well and properly hold Sections 401(a) and 407 to be constitutionally invalid. However, we are mindful of the admonition frequently made by the Supreme Court that the federal courts should refrain from invalidating statutes on constitutional grounds when there are other adequate grounds for decision.[6] Hence we do not rest decision on constitutional grounds. We have discussed these grounds only to point out the grave difficulties and inequalities that flow from the confused statutory picture.[7] These are unjust obstacles and pitfalls, almost impossible to overcome, by persons taken abroad in infancy, who seek to retain their United States citizenship acquired by birth in this country.

The evidence is conclusive that petitioner, Elsi, by voting in the Italian elec-

5. In Mandoli v. Acheson, 193 F.2d 920 (January 10, 1952), the Court of Appeals for the District of Columbia held that while the Nationality Act of 1940 does not impose any duty to return to the United States upon American-born children who are taken abroad during minority by alien parents who were never naturalized in the United States, nevertheless such children are under a common-law obligation to return within a reasonable time after majority or forfeit their American citizenship. This decision appears to be in conflict with the decision of the Supreme Court in Kawakita v. United States (June 2, 1952), and indeed the Solicitor General in his memorandum in response to the Mandoli petition for certiorari has confessed error in that decision. See Casey v. United States (June 9, 1952), footnote 5 of the dissenting opinion. But, even if the Mandoli ruling is correct, the discrimination inherent in Sections 401(a) and 407 of the Nationality Act of 1940 is not eliminated since those persons encompassed by these sections are required to return to the United States within a pre-scribed period, while those merely subject to a common-law duty need only return at some indefinite time that appears to be reasonable in their particular case.

6. Hurd v. Hodge, 1948, 334 U.S. 24, 30, 68 S.Ct. 847, 92 L.Ed. 1187; Rescue Army v. Municipal Court, 1947, 331 U.S. 549 at page 569, 67 S.Ct. 1409, 91 L. Ed. 1666; Alma Motor Co. v. Timkin-Detroit Axle Co., 1946, 329 U.S. 129, 136, 67 S.Ct. 231, 91 L.Ed. 128; Arkansas Fuel Oil Co. v. State of Louisiana ex rel. Muslow, 1938, 304 U.S. 197, 202, 58 S.Ct. 832, 82 L.Ed. 1287; Baker v. Grice, 1898, 169 U.S. 284, 292, 18 S.Ct. 323, 42 L.Ed. 748.

7. The new Immigration and Nationality Act of 1952, 66 Stat. 163, not yet effective, removes some of these inequalities by imposing certain requirements for the retention of American citizenship upon those dual nationals residing abroad who are not subject to the requirements of the 1940 Act. But, even this new Act does not entirely equalize the obligations to which the two classes are subjected.

tion of June 2, 1946, expatriated herself pursuant to the provisions of Section 401 (e) of the Nationality Act of 1940. There is no evidence that her act was anything but voluntary.[8] Since the expatriation of Elsi under Section 401(e) is clearly established, it is not necessary to consider the government's contentions that she was also expatriated pursuant to the provisions of Section 2 of the Expatriation Act of 1907 or pursuant to the provisions of Section 401(a) of the Nationality Act of 1940. It follows that, at the time that Elsi filed the instant petition, she was not a citizen of the United States. Hence she has no cause of action under section 503 of the Act of 1940, 8 U.S.C.A. § 903. No officer of the United States could deprive her of rights of citizenship which were then non-existent. She may, however, avail herself of the right granted a person, expatriated by voting in the Italian election of June 2, 1946, to become summarily naturalized pursuant to the Act of August 16, 1951, Public Law 114. 82nd Congress, 1st Session, 8 U.S.C.A. § 723 note. In such a proceeding, there may be litigated, if they have merit, any objections of the government to her naturalization, based upon alleged disabilities on her part arising pursuant to section 2 of the Act of 1907 or section 401(a) of the Act of 1940.

A decree may therefore enter, upon findings to be presented pursuant to the rules, in favor of petitioner Giovanni and against the petitioner Elsi.

Present findings and decree accordingly.

---

8. Her act not being involuntary, the many cases following Dos Reis ex rel. Camara v. Nicolls, supra, do not aid her cause.

Some of such cases are cited in footnote 2.